**[This opinion has been published in *Ohio Official Reports* at 73 Ohio St.3d 502.]**

THE STATE OF OHIO, APPELLEE, *v*. MACK, APPELLANT.

[Cite as *State v. Mack*, 1995-Ohio-273.]

*Criminal law—Aggravated murder—Death penalty upheld, when.*

(No. 94-483—Submitted March 21, 1995—Decided August 30, 1995.)

APPEAL from the Court of Appeals for Cuyahoga County, No. 62366.

————————————

{¶ 1} Peter Sanelli, along with his son Anthony, owned and operated Sandglo Glass and Mirror Company on Prospect Avenue in the city of Cleveland. On January 21, 1991, Thomas Sowell, Reginald Germany, and the defendant-appellant, Clarence Mack, carjacked Mr. Sanelli as he was leaving his business, fatally shooting him and stealing his car.

{¶ 2} Mr. Sanelli was last seen around 5:45 p.m. by his son Anthony. At that time, Anthony went home for the day, leaving Mr. Sanelli at Sandglo. Before he left, Anthony gave his father a package of nails that he would need for a job. Mr. Sanelli's body was found around 6:10 p.m. lying in the middle of the parking lot next to Sandglo. Dr. Robert Challener of the Cuyahoga County Coroner's Office later testified that the autopsy performed by Dr. Kalil Jiraki showed that Mr. Sanelli had been shot three times, and died from these wounds. One bullet entered the left side of the victim's face, somewhat below the ear. The irregular entrance wound indicated that the bullet had come in contact with an intermediate object such as glass before striking the victim . The other two bullets were fired into Mr. Sanelli's left shoulder from close range. One of these bullets struck Mr. Sanelli's left lung and tore the sac which surrounds the heart. A pellet with its copper jacket was retrieved from the right sleeve of Mr. Sanelli's undershirt.

{¶ 3} Detective Leo Allen investigated Mr. Sanelli's murder. At the scene where the body was found, Detective Allen discovered three nine-millimeter shell

casings on the street three to five feet from the curb. A fourth shell casing was discovered on the sidewalk behind the Dome Grille, a neighboring business.

{¶ 4} Mr. Sanelli's car, a 1987 light blue or silver Plymouth Horizon with red and white truck license plates, was found around 7:15 p.m. It had been crashed into a utility pole at East 90th and Holton Avenue. The front driver's side window and rear passenger side window were broken out. Anthony Sanelli testified that the car's windows were all intact when he last saw his father before the murder. An apparent bullet indentation was discovered on the rear passenger door, and a bullet hole was found in the back side of the passenger front seat. Part of a copper jacket to a nine-millimeter bullet was found in the car. No fingerprints were found.

{¶ 5} On January 23, 1991, two days after the murder of Peter Sanelli, Timothy Willis approached the Sanelli family with information regarding the murder. The Sanelli family sent Willis to the police. At approximately 2:30 p.m. on January 23, Mr. Willis called Lt. John James, and told him the following story.

{¶ 6} Willis stated that on January 21, 1991, he was approached around 5:30 p.m. by the appellant, Thomas Sowell and Reginald Germany, who were looking to buy a gun to aid them in stealing a car. When Willis refused, Germany told Sowell that he had a nine-millimeter gun which Sowell could borrow. The three then drove away. Later around 6:45 p.m. the appellant and Sowell drove up to Willis in a silver Plymouth Horizon. Willis especially noticed that the automobile had red and white license plates and that the back passenger and front driver side windows were broken out. Sowell told Willis that they had obtained the car on Prospect Avenue. The appellant and Sowell then discussed in front of Willis their reasons for shooting "the man." Sowell said that he had fired at the car window because the man disobeyed his instructions by attempting to lock his door. The appellant claimed that he had started shooting because Sowell had fired. During this discussion, Willis noticed a pair of binoculars. Anthony Sanelli testified that his father kept a pair of binoculars in the

2

car. Later that evening, Willis recognized the car driven by the appellant and Sowell on the evening news story about the murder of Peter Sanelli.

{¶ 7} On January 22, 1991, Willis met the appellant and Germany at approximately 9:00 p.m. and drove around with them in a red van. Willis specifically asked the appellant and Germany where they got the silver Plymouth Horizon. The appellant again told Willis that they got it from the downtown area. The appellant and Germany laughed as they related how Sowell had injured his nose when he crashed the stolen car into a pole.

{¶ 8} After Willis told the police this story, he informed them where and when they might locate the appellant, Germany and Sowell. Based on the information given by Willis, the police dispatched officers to arrest these men. Willis had told the police that the appellant and Germany were on their way to his address. The police saw a red van matching the description given by Willis park in front of Willis's house at around 4:30 p.m. Reginald Germany, the appellant, and Maurice Washington exited. A fourth man, Brian McKinney, remained in the van. Reginald Germany exited the driver's side of the van holding a nine-millimeter gun in one hand, which he immediately dropped to the ground as the police approached. The officers stopped and frisked each of the men, and searched the van. The officers felt and uncovered a nine-millimeter gun in a holster under the appellant's coat. The police also found a third gun on the floor of the van at the feet of Brian McKinney. Appellant's and Germany's guns were loaded, and two additional clips were recovered from the appellant's pockets as well. The men were taken into custody by the police.

{¶ 9} Willis told police that Thomas Sowell could be located at Cleveland Industrial Drum. Police arrested Sowell there, and discovered a nail in his pocket that matched the type of nails Anthony Sanelli had given his father shortly before Peter Sanelli was murdered.

{¶ 10} Detective Qualey, along with Lt. John James, questioned the appellant on January 23, 1991, at approximately 4:30 p.m. after the appellant's arrest. After

advising the appellant of his <u>Miranda</u> rights, as printed on a standard police card, Det. Qualey questioned the appellant about the nine-millimeter gun that had been found on the appellant's person at the time of the arrest. Appellant stated that he had bought the gun on January 22, 1991, from an individual who was unknown to him. Further, the appellant denied any knowledge of, or involvement in, the murder of Peter Sanelli. After about an hour of interrogation, appellant was returned to his cell.

{¶ 11} About half an hour later Detective Qualey became aware of the results of ballistics tests. The tests revealed that the three spent shell casings found on the street at the murder scene and the bullet found on Peter Sanelli at the morgue had come from appellant's nine-millimeter gun. The ballistics tests also revealed that the gun confiscated from Reginald Germany at the time of his arrest had fired the spent shell casing found on the sidewalk outside the Dome Grille and the copper bullet jacket found in the stolen car.

{¶ 12} Detective Qualey reapproached appellant and asked if he knew his rights, to which appellant responded "yeah." After being informed of the ballistics tests, appellant changed his story. He stated that he had loaned the nine-millimeter handgun to a stranger known to him only as "Dee" the day before the murder of Peter Sanelli. Appellant claimed that Dee had needed protection because he was going to a party. The gun had been returned to the appellant the day after Sanelli's murder. The appellant noticed that the gun had been fired but did not ask why.

{¶ 13} The grand jury indicted appellant for two aggravated murder counts as well as aggravated robbery. Each murder count included a death penalty specification alleging murder during an aggravated robbery in violation of R.C. 2929.04(A)(7). Count One of the indictment, which charged appellant with purposely causing the death of Peter Sanelli with prior calculation and design, was eventually nolled.

{¶ 14} The trial began on July 1, 1991. A key question during the selection of jurors concerned their views on the death penalty and their ability to apply the law as

4

given to them by the judge. Two potential jurors, Mr. Spelic and Ms. Davis, were dismissed at the prosecution's request because they stated that due to moral concerns or personal beliefs they could never consider imposing the death penalty even if so instructed by the law as defined by the judge. Three jurors expressed strong support for the application of the death penalty. Mr. Leib stated that he personally felt that if someone kills someone else, "they've got it coming." Mr. Jurecki and Ms. Frankel also stated personal support for the use of the death penalty. Each of these three jurors, however, stated that he or she would apply the law as given by the trial court judge, which might necessitate finding the appellant innocent, or sentencing him to life in prison. Ms. Frankel was removed by a peremptory challenge by the defense. The defense never moved to remove Mr. Jurecki for cause. The defense did move to have Mr. Leib removed for cause, but this motion was denied by the court.

*Guilt Phase*

{¶ 15} The prosecution called several witnesses in its case against the appellant. Dr. Robert Challener of the Cuyahoga County Coroner's Office testified regarding the results of Dr. Kalil Jiraki's autopsy on Peter Sanelli. The state also called Detective Edward Lucey to testify regarding the results of the examination which he and other police experts had conducted on the bullet and shell casings. The prosecution's key witness was Willis, who testified as to the story he told the police.

{¶ 16} The defense attempted to call Carole Mancino, one of the appellant's attorneys, to provide testimony to impeach Mr. Willis. The trial court refused to allow her to testify. Ms. Mancino proffered that she would have testified about an interview she had with Timothy Willis on May 2, 1991. At that time, Willis was in jail along with the appellant, Germany, and Sowell, who were awaiting trial for the murder of Peter Sanelli. Ms. Mancino claims that Willis told her the following story. Willis never saw any of the defendants on January 21, 1991. Willis did see the appellant and Germany on January 22, 1991 when they came to his house to get a car part, and on January 23, 1991, the appellant and Germany drove to the front of his house to pick

Willis up. Willis stated that the appellant and Germany were "good guys" and he could not believe they were involved in something like this. When asked how the police knew that the appellant and Germany would be at Willis's house at 4:30 P.M. on January 23, 1991, Willis responded that he suspected his phone was bugged due to his suspected implication in another crime.

{¶ 17} On the witness stand, Willis had testified that he told Ms. Mancino that he did not know anything about the murder of Peter Sanelli. The prosecution pointed out that Willis was in the same jail as the men he had fingered. The trial judge ruled to suppress Ms. Mancino's testimony.

{¶ 18} The appellant's cousin, Curtis Mack, testified that he saw numerous firearms and handmade weapons at Willis's house, and that he knew that Willis carried and sold firearms. The appellant's cousin was not allowed by the court to testify regarding a conversation he had with Willis on the night the appellant was arrested. The defense proffered into the record that Curtis Mack would have testified that Willis said he knew the appellant had nothing to do with Sanelli's murder and that Willis admitted that he, in fact, killed Sanelli.

{¶ 19} The defense called DeMille Blue, Thomas Sowell's girlfriend, who testified that on the day of the murder, January 21, 1991, she cooked dinner for Sowell, Mack, Germany and others. Ms. Blue claimed that she was cooking when Clarence Mack arrived at 5:00 p.m. and that he did not leave until about 8:00 p.m. On cross-examination Ms. Blue asserted that Thomas Sowell did not own any firearms and that Clarence Mack did not have a firearm while he was at her house. The prosecution called Detective Norman Sherwood in rebuttal. Detective Sherwood testified that when he spoke with Ms. Blue on January 25, 1991, she told him that she had not begun cooking her Martin Luther King Day dinner until 6:00 p.m.

{¶ 20} John Scott, the boyfriend of Clarence Mack's sister, testified for the defense that Timothy Willis owned several firearms and weapons, including nine-millimeters. He identified the gun found on the person of the appellant as one of the

firearms owned by Willis in December 1990, testifying that he himself had wished to purchase it, but did not have the cash. Scott asserted that he and the appellant had gone to Willis's house sometime between 1:00 p.m. and 5:00 p.m. the day after the murder, at which time Clarence Mack purchased the handgun.

{¶ 21} Barbara Lackey, Clarence Mack's girlfriend, testified that the first time she ever saw Clarence Mack with the weapon was the day after the murder.

{¶ 22} After considering the evidence, the jury recommended the death penalty. The trial court agreed and sentenced Mack to death. The Court of Appeals for Cuyahoga County affirmed Mack's convictions and death penalty. The case is now before this court upon an appeal as of right.

————————

*Stephanie Tubbs Jones*, Cuyahoga County Prosecuting Attorney, *Richard J. Bombik* and *George J. Sadd*, Assistant Prosecuting Attorneys, for appellee.

*Thomas P. Gill* and *Kevin M. Spellacy*, for appellant.

————————

**PFEIFER, J.**

{¶ 23} Appellant presents a number of issues for our consideration. (See Appendix, *infra*.) We have carefully considered each of appellant's propositions of law, independently weighed the aggravating circumstances against the evidence presented in mitigation, and reviewed the death penalty for appropriateness and proportionality. For the reasons that follow, we affirm the judgment of the court of appeals and uphold appellant's death sentence.

I

{¶ 24} R.C. 2929.05 requires this court to review capital cases in a certain manner. However, as we have held on a number of previous occasions, R.C. 2929.05 does not require this court to address and discuss, in opinion form, each and every proposition of law raised by the parties. See, *e.g., State v. Poindexter* (1988), 36 Ohio St.3d 1, 520 N.E.2d 568, syllabus; *State v. Bonnell* (1991), 61 Ohio

St.3d 179, 181, 573 N.E.2d 1082, 1085; *State v. Hawkins* (1993), 66 Ohio St.3d 339, 342, 612 N.E.2d 1227, 1230; and *State v. Scudder* (1994), 71 Ohio St.3d 263, 267, 643 N.E.2d 524, 528. We adhere to that position today. Upon a careful review of the record and the governing law, we fail to detect any errors that would undermine our confidence in the integrity and reliability of the trial court's findings. We address, in opinion form, only those issues that warrant some discussion.

II

{¶ 25} In his second proposition of law, appellant contends that where a particularized need is demonstrated by the defense for the examination of grand jury testimony, the failure of the trial court to provide defense counsel with the testimony deprives a defendant of a fair trial.

{¶ 26} Appellant claims that he needed the grand jury transcript to examine the testimony of Timothy Willis, who the defense claims fabricated his story to conceal his own involvement in Peter Sanelli's murder, and that those grounds constituted a particularized need. We disagree.

{¶ 27} Crim.R. 6(E) controls the disclosure of grand jury testimony. Matters occurring before a grand jury may be disclosed "when permitted by the court at the request of the defendant upon a showing that grounds may exist for a motion to dismiss the indictment because of matters occurring before the grand jury." *Id.*

{¶ 28} In *State v. Laskey* (1970), 21 Ohio St.2d 187, 50 O.O.2d 432, 257 N.E.2d 65, this court set forth the standard for considering such a request. "* * * Generally, proceedings before a grand jury are secret and an accused is not entitled to inspect grand jury minutes before trial [or at trial]* * *. This rule is relaxed only when the ends of justice require it, such as when the defense shows that a particularized need exists for the minutes which outweighs the policy of secrecy." *Id.* at 191, 50 O.O.2d at 434, 257 N.E.,2d at 68.

**{¶ 29}** In *State v. Greer* (1981), 66 Ohio St.2d 139. 20 O.O.3d 157, 420 N.E.2d 982, this court expounded upon this rule, stating:

"Whether particularized need for disclosure of grand jury testimony is shown is a question of fact; but, generally, it is shown where from a consideration of all the surrounding circumstances it is probable that the failure to disclose the testimony will deprive the defendant of a fair adjudication of the allegations placed in issue by the witness' trial testimony." *Id.* at paragraph three of the syllabus.

**{¶ 30}** In *State v. Brown* (1988), 38 Ohio St.3d 305, 308, 528 N.E.2d 523, 530, this court held that a trial court did not abuse its discretion when it overruled a motion to inspect grand jury testimony where the alleged particularized need was that the transcript would indicate whether the indictment was properly issued.

**{¶ 31}** In this case, the record reveals no abuse of discretion on the part of the trial court in its denial of appellant's request to review the grand jury testimony. The appellant failed to demonstrate a particularized need to inspect the grand jury testimony. His bald assertion on appeal that he needed to examine the testimony of an adverse witness for inconsistencies failed to set forth a particularized need.

**{¶ 32}** When a defendant "speculates that the grand jury testimony might have contained material evidence or might have aided his cross-examination * * * by revealing contradictions," the trial court does not abuse its discretion by finding the defendant had not shown a particularized need. *State v. Webb* (1994), 70 Ohio St.3d 325, 337, 638 N.E.2d 1023, 1034.

**{¶ 33}** In the present case, we have reviewed the record as a whole and are convinced that the trial court did not abuse its discretion in denying appellant's request to review grand jury testimony. Accordingly, we reject appellant's second proposition of law.

### III

**{¶ 34}** Appellant's fourth and fifth propositions of law claim that the trial court abused its discretion when it dismissed for cause potential jurors who

expressed reservations on recommending the death penalty and when it denied motions to remove potential jurors for cause who favored the death penalty. Neither of these propositions is supported by the record. Appellant argues that the trial court failed to allow an impartial jury to hear the case by overruling appellant's motions for dismissal for cause of prospective jurors Leib, Jurecki, and Frankel, who were allegedly predisposed towards the death penalty, and by sustaining the state's motions for dismissal of prospective jurors Spelic and Davis, who stated they could not vote for the death penalty.

{¶ 35} In order for a defendant to be properly convicted of a crime, a guilty verdict must be returned by a fair and impartial jury composed of a fair and representative cross-section of the community as mandated by the Sixth Amendment of the United States Constitution and Section 10, Article I, Ohio Constitution. This court in *State v. Tyler* (1990), 50 Ohio St. 3d 24, 553 N.E.2d 576, stated that a prospective juror must be willing to follow the applicable law as given by the trial judge in the jury instructions. "'[A] juror may not be challenged for cause based on his views about capital punishment unless those views would prevent or substantially impair the performance of his duties as juror in accordance with his instructions and his oath.'" *Id.* at 30, 553 N.E.2d at 586, quoting *Adams v. Texas* (1980), 448 U.S. 38, 45, 100 S.Ct. 2521, 2526, 65 L.Ed.2d 581, 585. Improperly conducted voir dire may constitute reversible error only upon a showing of abuse of discretion by the trial court. *State v. Rogers* (1985), 17 Ohio St. 3d 174, 179, 17 OBR 414, 418, 478 N.E.2d 984, 990.

{¶ 36} Applying the above standards to the record shows that the trial court did not abuse its discretion by dismissing the antideath penalty-jurors because they indicated that they could not recommend the imposition of the death penalty under any circumstances. When asked whether he could fairly consider the death penalty, potential juror Spelic stated, "I don't think I could ever recommend it, no." Furthermore, in response to the trial court's questioning about his ability to sign a

verdict recommending the death penalty, Spelic stated, "I don't think so. No matter what the circumstances were I wouldn't be able to sign anything recommending the death penalty, no." Similarly, potential juror Davis answered "no" to the trial court's questions of whether she could sign a verdict form recommending the death penalty under any set of circumstances and whether she could follow the law if it mandated the death penalty. When the evidence in the record shows that a potential juror will not follow the law concerning the death penalty, the trial court does not abuse its discretion in dismissing that juror for cause. The responses of these two prospective jurors gave the trial court ample reason to believe that they would be unable to follow their oath and would be substantially impaired in performing their duties as jurors. A juror must be able to follow the law as provided in the jury instructions, and if during voir dire the trial court feels that a juror cannot follow the law and the record supports this decision, then it is not an abuse of discretion to excuse the juror for cause.

{¶ 37} With regard to potential jurors Leib, Jurecki, and Frankel, appellant argues in his fifth proposition of law that the trial court erred in overruling his challenges for cause to dismiss these jurors. Leib and Jurecki were members of the final jury. Frankel was excluded by defense counsel's third peremptory challenge. Appellant subsequently exhausted his six peremptory challenges.

{¶ 38} The record reflects that defense counsel failed to move to have Jurecki removed for cause. According to *State v. Greer* (1988), 39 Ohio St. 3d 236, 244, 530 N.E.2d 382, 394, the doctrine of waiver applies in capital cases and therefore appellant waived this error, if any existed, as it pertains to potential juror Jurecki.

{¶ 39} To determine whether potential jurors Leib and Frankel should have been dismissed for cause, we apply the previously mentioned *Witt* standard of whether the prospective juror's views would prevent or substantially impair the performance of their duties according to their instructions and oath. *State v. Rogers*,

17 Ohio St. 3d 174, 17 OBR 414, 478 N.E.2d 984, paragraph three of the syllabus. The transcript reveals that Leib and Frankel initially revealed a predisposition toward imposing the death penalty; however, both later stated to the trial judge that they would follow the law set forth in his instructions. Because the trial court's denials of appellant's challenges for cause are supported by the record, we find that the trial court did not abuse its discretion and hereby overrule appellant's fifth assignment of error.

IV

**{¶ 40}** In his eighth proposition of law, appellant contends that he was denied due process of law when the trial court admitted the expert testimony of Detective Thomas L. Lucey. Appellant argues that Detective Lucey was improperly qualified as an expert witness, that Lucey's opinions were improperly based on hearsay opinions of others, and, thus, the admission of his testimony violated appellant's right to due process of law. We disagree.

**{¶ 41}** The question here turns on whether Detective Lucey's testimony as a ballistics expert satisfied the requirements of both Evid.R. 702 and 703. For the following reasons we believe that it did.

**{¶ 42}** Former Evid.R. 702 provided: "If scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training, or education, may testify thereto in the form of an opinion or otherwise." As appellant notes in his brief, the testimony of Detective Lucey was critical in establishing the relationship between the bullets and casings found at the crime scene and the weapon found on the appellant at the time of his arrest. Clearly, Detective Lucey's testimony assisted the jury in its understanding of the technical ballistics report submitted into evidence and "aid[ed] [the jury] in the search for the truth." *Alexander v. Mt. Carmel Med. Ctr.* (1978), 56 Ohio St.2d 155, 159, 10

O.O.3d 332, 334, 383 N.E.2d 564, 566. However, appellant questions Detective Lucey's qualifications as an expert witness.

**{¶ 43}** The record shows that Detective Lucey's qualifications satisfied the requirements of Evid.R. 702. Detective Lucey has performed firearm and tool mark examinations for the Scientific Investigation Unit of the Cleveland Police Department for the past five years. During his tenure with the forensic laboratory, he has examined in excess of one thousand guns. He was trained in firearm identification by Victor Kovacic, a twenty-five-year veteran in the field. Detective Lucey is a member of the Firearm and Tool Mark Examiners and Ohio Criminalists Associations. Moreover, he has testified over sixty times as an expert witness in various courts throughout Ohio.

**{¶ 44}** "The qualification of an expert is a matter for determination by the court on the facts, and rulings with respect to such matters will ordinarily not be reversed unless there is a clear showing that the court abused its discretion." *State v. Maupin* (1975), 42 Ohio St.2d 473, 479, 71 O.O.2d 485, 488, 330 N.E. 2d 708, 713; see, also, *State v. Tomlin* (1992), 63 Ohio St.3d 724, 728, 590 N.E.2d 1253, 1256. Qualifications which may satisfy the requirements of Evid.R. 702 are multitudinous. This court has held that there is no "degree" requirement, *per se*. Professional experience and training in a particular field may be sufficient to qualify one as an expert. *State v. Beuke* (1988), 38 Ohio St.3d 29, 43, 526 N.E.2d 274, 289. Detective Lucey's extensive background was, indeed, sufficient to qualify him as an expert in the field of ballistics. The trial court did not abuse its discretion by allowing his expert testimony.

**{¶ 45}** Appellant further argues that Detective Lucey's testimony was improperly based upon inadmissible hearsay opinions of others within the forensic laboratory. Evid.R. 703 requires that an expert base an opinion or inference on facts or data either perceived by him or admitted into evidence. Here, Detective Lucey test-fired the gun confiscated from appellant upon his arrest. Detective Lucey

compared the test shot with the morgue bullet recovered from the victim, Peter Sanelli, and the spent shell casings recovered from the crime scene, concluding that all had been discharged from appellant's gun. Doubtlessly based on his own observations, the findings of the ballistics examination were well within Detective Lucey's personal knowledge.

{¶ 46} Notwithstanding Detective Lucey's personal analysis of the evidence, appellant is troubled by the corroborative procedure of the forensic laboratory, where "two or three or even more individuals view the findings" of any one examination. Appellant cites *Zelenka v. Indus. Comm.* (1956), 165 Ohio St. 587, 594, 60 O.O. 524, 528, 138 N.E.2d 667, 661, for the proposition that "the opinion of an expert witness cannot be predicated either in whole or in part upon the opinions, inferences and conclusions of others, whether expert or lay witnesses."

{¶ 47} Appellant's reliance on *Zelenka* is, however, misplaced. In a case decided since *Zelenka*, this court found admissible the opinions of doctors to be "based on facts or data perceived by [them]" within the meaning of Evid.R. 703, despite their being partially based on medical reports not in evidence, where the doctors had personally examined the defendant. *State v. Solomon* (1991), 59 Ohio St.3d 124, 570 N.E.2d 1118. Speaking for the majority, Justice Douglas opined, "[w]here an expert bases his opinion, in whole or in major part, on facts or data *perceived by him*, the requirement of Evid.R. 703 has been satisfied." (Emphasis added.) *Id.* at syllabus.

{¶ 48} In this case, Detective Lucey conducted extensive analysis upon appellant's gun, the morgue bullet recovered from the victim, and the shell casings recovered from the crime scene. The fact that his colleagues in the laboratory may have confirmed, or even debated, his findings does not remove his opinion beyond the boundaries for admissible expert testimony prescribed by Evid.R. 703. Accordingly, we reject appellant's eighth proposition of law.

V

**{¶ 49}** In his ninth proposition of law, appellant claims he was denied his constitutional right against self-incrimination as guaranteed by the Fifth and Fourteenth Amendments the United States Constitution and Section 10, Article I of the Ohio Constitution. His contention rests on the failure of investigators fully to re-administer the *Miranda* warnings to him at the outset of a second interview, where the first interview preceded the second by a relatively short period of time and the investigators fully informed appellant of his *Miranda* rights at the beginning of the first interview. For the following reasons we find appellant's claim to be without merit.

**{¶ 50}** In *Miranda v. Arizona* (1966), 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694, the United States Supreme Court enunciated the standards by which custodial police interrogations are to be conducted in order to safeguard defendants' rights under the Constitution. The purpose of the *Miranda* warnings is "to dissipate the compulsion [by police] inherent in custodial interrogation and, in so doing, guard against abridgment of suspect's Fifth Amendment rights." *Moran v. Burbine* (1986), 475 U.S. 412, 425, 106 S.Ct. 1135, 1143, 89 L.Ed. 2d 410, 421. The threshold requirement of *Miranda* is that the suspect must be informed in clear and unequivocal terms that he has the right to remain silent. 384 U.S. at 467-468, 86 S.Ct. at 1624, 16 L.Ed.2d at 719. Only after such warning may a suspect be deemed capable of "knowingly and intelligently" waiving his rights and agreeing to answer questions or make a statement. *Id.* at 479, 86 S. Ct. at 1630, 16 L.Ed.2d at 726.

**{¶ 51}** Appellant here takes issue with investigators' failure fully to re-administer the *Miranda* warnings before beginning interrogation for a second time. On January 23, 1991, appellant was transported after his arrest by Detective Qualey and Lt. James to an interview room in the Homicide Unit in the Justice Center. Detective Qualey informed appellant of his *Miranda* rights and asked him if he understood those rights, to which he responded in the affirmative. Thereafter Lt.

James began to question appellant and Detective Qualey took notes. Appellant answered voluntarily, stating that he did not know anything about the death of Peter Sanelli. The interview lasted approximately forty-five minutes to one hour.

{¶ 52} After returning appellant to his cell, Detective Qualey received the ballistics report from the forensic laboratory matching the morgue bullet recovered from the victim and the shell casings found at the crime scene with the gun confiscated from appellant. With this new information in hand, Detective Qualey and Lt. James brought appellant back to the Homicide Unit to resume questioning approximately one-half hour to one hour after the first interview had ended. Without explicitly reciting the *Miranda* warnings again, Detective Qualey asked appellant if he understood his rights and he said yes. When confronted with the new evidence, appellant provided a brief explanation and denied any involvement in the killing of Peter Sanelli. Questioning ceased soon thereafter when appellant made a request for counsel, and he was returned to his cell. The second interview lasted approximately thirty minutes.

{¶ 53} Appellant's contention that he was denied his right against self-incrimination is not borne out by the facts. After being read his *Miranda* rights, appellant voluntarily submitted to questioning by Detective Qualey and Lt. James. When the interview ended, appellant had yet to invoke his right to silence or to counsel. When Detective Qualey and Lt. James sought to resume questioning they asked appellant, again, if he understood his rights, and again appellant answered in the affirmative and voluntarily answered questions.

{¶ 54} Moreover, the cases give no indication of a requirement upon police to re-administer the *Miranda* warnings, when questioning a suspect again after a relatively short period of time. In fact, the time between the first and second interviews in question is significantly shorter than that sustained in other cases. See. *e.g., Stumes v. Solem* (C.A.8, 1985), 752 F.2d 317 (five hours); *Evans v. McCotter* (C.A.5, 1986), 790 F.2d 1232 (one to one and one-half hours).

**{¶ 55}** Accordingly, we reject appellant's ninth proposition of law.

VI

**{¶ 56}** In his tenth proposition of law, appellant argues that the trial court abused its discretion by refusing to allow the defense to introduce extrinsic evidence of a prior inconsistent statement by a key state witness. Appellant contends the trial court's refusal inhibited his ability to impeach the testimony of the witness and, therefore, effectively denied his right to a fair trial. We disagree.

**{¶ 57}** In an effort to impeach the testimony of the state's witness, Timothy Willis, appellant sought to introduce extrinsic evidence of prior inconsistent statements made by Willis at different times to Carole Mancino, co-counsel for appellant, and Curtis Mack, cousin of appellant. Appellant proffered the testimony of both Mancino and Curtis Mack, after the trial court refused to allow them to testify.

**{¶ 58}** Evid. R. 613(B) states: "Extrinsic evidence of a prior inconsistent statement by a witness is not admissible unless the witness is afforded a prior opportunity to explain or deny the same and the opposite party is afforded an opportunity to interrogate him thereon, or the interests of justice otherwise require. * * *"

**{¶ 59}** In her proffer to the record, Carole Mancino testified that Willis had told her that " he [Willis] can't believe Clarence would do anything like this." This statement is actually consistent with those made by Willis while on the stand during the trial. Willis stated that he had told Carole Mancino that he "can't believe that Clarence would do something like this." Because there is no contradiction between the statement made by Willis to Carole Mancino and his statement made on the stand, the statement is not a prior inconsistent statement and was properly excluded.

**{¶ 60}** Carole Mancino's proffered testimony also states that during their conversation, Willis said he didn't think he had seen Clarence Mack on the murder date. We hold that this portion of Mancino's proffered testimony was properly

17

excluded because appellant failed to lay a proper foundation for its admission under Evid.R. 613(B). "When extrinsic evidence of a prior inconsistent statement * * * is offered into evidence pursuant to Evid.R. 613(B), a foundation must be established through direct or cross-examination in which: (1) the witness is presented with the former statement; (2) the witness is asked whether he made the statement; (3) the witness is given an opportunity to admit, deny or explain the statement; and (4) the opposing party is given an opportunity to interrogate the witness on the inconsistent statement." *State v. Theuring* (1988), 46 Ohio App.3d 152, 155, 546 N.E.2d 436, 439. By examining the record, we find that Willis was never specifically asked if he had told Carole Mancino that he had not seen appellant on the day of Sanelli's murder. Willis was asked on the stand if he told Mancino that Clarence Mack had visited him at his home on the murder day. Because Willis was never specifically asked about this statement on the stand, no foundation was laid for its introduction into evidence.

{¶ 61} Carole Mancino also proffered that during their conversation, Willis had denied calling the police. During his trial testimony, Willis stated that he did not remember if he had made this statement to Mancino. While we find that Mancino's testimony to impeach Willis's ambiguous answer should have been admitted by the trial court, we also find that the trial court's exclusion of this testimony did little to prejudice Clarence Mack. There was an abundance of other credible inculpatory evidence even if the jury were to conclude that Willis did not call the police.

{¶ 62} The statements made by Willis to Curtis Mack were also inadmissible extrinsic evidence because appellant failed to lay a proper foundation for their admission. Curtis Mack claimed that Willis had admitted murdering Peter Sanelli. Appellant, however, never asked Willis during the trial whether he had ever made this statement to Curtis Mack. Thus, a proper foundation was not laid

for admission of the extrinsic evidence. We, therefore, reject appellant's tenth proposition of law.

## VII

{¶ 63} Having considered appellant's propositions of law, we must now review appellant's death sentence for appropriateness and proportionality. We find that the aggravating circumstance of which appellant was found guilty, which is set forth in R.C. 2929.04(A)(7), was proven beyond a reasonable doubt.

{¶ 64} In mitigation, appellant presented the testimony of several witnesses. They indicated that appellant had lived a tough childhood and was a caring individual.

{¶ 65} Finally, appellant gave an unsworn statement in which he denied that he shot Sanelli.

{¶ 66} Upon review of the evidence presented in mitigation, it is clear to us that appellant had a troubled and difficult childhood. We find that appellant's troubled childhood and his general history and background are entitled to some weight in mitigation.

{¶ 67} The nature and circumstances of the offense do not reveal any matter of mitigating value. Further, we find that appellant did not establish the existence of any of the R.C. 2929.04(B) mitigating factors by a preponderance of the evidence.

{¶ 68} Weighing the aggravated circumstances against the evidence presented in mitigation, we find that the aggravating circumstances outweigh the mitigating factors beyond a reasonable doubt.

{¶ 69} In his brief, appellant contends that his death sentence is inappropriate because of the existence of residual doubt about whether appellant murdered Sanelli. We disagree. There is an abundance of credible evidence in the record which convinces us that appellant murdered Peter Sanelli. Appellant possessed the murder weapon when he was apprehended by the police. Appellant

was observed in a car matching the description of Mr. Sanelli's car on the day of the murder. Finally, appellant told Willis that he killed Mr. Sanelli.

{¶ 70} As a final matter, we have compared the sentence imposed in this case to those in which we have previously imposed the death penalty. We find that appellant's death sentence is neither excessive nor disproportionate. See, *e.g.*, *State v. Tyler* (1994), 71 Ohio St.3d 398, 643 N.E.2d 1150; *State V. Lewis* (1993), 67 Ohio St.3d 200, 616 N.E.2d 921; *State v. Sneed* (1992), 63 Ohio St.3d 3, 584 N.E.2d 1160.

{¶ 71} Accordingly, we affirm the judgment of the court of appeals.

*Judgment affirmed.*

MOYER, C.J., DOUGLAS, RESNICK and F.E. SWEENEY, JJ., concur.

WRIGHT and COOK, JJ., dissent.

———————————

**WRIGHT, J., dissenting.**

{¶ 72} I must respectfully dissent. I concur with the majority's treatment of almost all of the alleged errors raised by appellant. For the most part, those propositions of law concern matters which were within the trial court's discretion, were not raised in the court of appeals, or were otherwise waived by counsel for the appellant.

{¶ 73} However, the trial court's refusal to allow Curtis Mack to testify about the bias of Timothy Willis was an error that most certainly was not waived by counsel, and, in my view, a proper ruling could have led to an entirely different result during the guilt phase of this trial.

{¶ 74} The appellant's trial counsel proferred that Curtis Mack, a corrections officer, would have testified: " [O]n January 23rd, sometime in the evening Tim Willis came in and he said he wanted to talk to [Curtis Mack] about Clarence and Reggie. And he said that he knew that Clarence and Reggie didn't have anything to do with this murder that happened on Martin Luther King's Day. He said he knew who did it and because -- then Mr. Curtis Mack asked him, 'Well, who did it?' He said, 'Well, your mother is around here, I'll talk to you later about that.' They went upstairs later and he indicated to them that Clarence and Reggie would never do anything like this, they didn't have the heart for something like this. And then at the insistence of Mr. Mack he asked, 'Well, who did it?' He said, 'Don't you know that I did it?'" The majority only lightly touches on this issue, suggesting that this was harmless error.

{¶ 75} Any sort of rational review of the record in this case reveals that Willis's testimony was critical to the state's case. Willis is the only witness who places appellant at the scene of the crime. Willis is the only witness who testified that appellant was in a position to fire a shot at Sanelli. Willis is the only witness who in any way related that appellant had a motive to commit the crime. Willis is the only witness who described in any sort of detail the automobile that appellant

and co-defendant Thomas Sowell were allegedly driving on the day of the crime. In a word, Willis was a key witness for the state whose testimony was critical to the conviction of appellant. If his credibility would have been impugned, the issue of the appellant's guilt would have been a close call at best.

{¶ 76} The trial court refused to allow Curtis Mack to testify as to Willis's confession, apparently on the theory that no foundation was in place for impeachment of Willis's testimony. However, a flat confession of the crime at issue clearly goes to bias. See, *e.g.*, *State v. Williams* (1988), 61 Ohio App.3d 594, 597-598, 573 N.E.2d 704, 705-706, holding that impeachment by extrinsic evidence is permissible to show the witness's bias and that the exclusion of such testimony is reversible error. Where bias is at issue, Evid.R. 616, which became effective on July 1, 1991, specifically provides that bias may be shown by extrinsic evidence: "Bias, prejudice, interest, or any motive to misrepresent may be shown to impeach the witness either by examination of the witness or by extrinsic evidence." See, also, *State v. Ferguson* (1983), 5 Ohio St.3d 160, 165-166, 5 OBR 380, 385-386, 450 N.E.2d 265, 269-271. Likewise, there is no doubt that a foundation need not be laid in Ohio as a prerequisite for the introduction of extrinsic evidence of a witness's bias. See *State v. Kehn* (1977), 50 Ohio St.2d 11, 19, 4 O.O.3d 74, 78, 361 N.E.2d 1330, 1335; *State v. Carlson* (1986), 31 Ohio App.3d 72, 75, 31 OBR 112, 115, 508 N.E.2d 999, 1002. See, also, 1 Weissenberger, Ohio Evidence (1985) 32-3, Witnesses, Section 607.7. Consequently, the trial court was clearly mistaken when it ruled that Curtis Mack's testimony as to Willis's confession could not be admitted.

{¶ 77} I would have to agree that the jury may well have decided that Curtis Mack himself was not credible and thus rejected his testimony. But as a reviewing court, it is difficult to say that this would necessarily have been the case, keeping in mind the matters noted above. Mack's credibility was for the jury to decide. When all is said and done, this is why we had reversible error here.

**{¶ 78}** There is no way that we should treat the refusal to allow Curtis Mack's testimony as harmless error, because the testimony could have demonstrated that the key witness for the state had confessed his own guilt of the murder. If the jury had accepted Curtis Mack's testimony, obviously we could have had an entirely different verdict. As stated above, Willis was the linchpin of the state's case, and to a large extent the prosecution's case would stand or fall on Willis's credibility.

**{¶ 79}** I will not discuss in length the exclusion of the proffered testimony of Carole Mancino, appellant's trial co-counsel, concerning Willis's statements to her, since her proffered testimony was not as strong as Curtis Mack's proffered testimony. However, I think it obvious that she had a perfect right to testify. Had Mancino testisfied, she may have been in violation of the Code of Professional Responsibility, which requires an attorney to withdraw from a case after discovering that she may be called to testify. See *Mentor Lagoons, Inc. v. Rubin* (1987), 31 Ohio St.3d 256, 510 N.E.2d 379. See, also, *155 N. High Ltd. v. Cincinnati Ins. Co.* (1991), 75 Ohio App.3d 253, 599 N.E.2d 352, interpreting *Mentor Lagoons, Inc*. However, surely a defendant in a capital case should not be punished for the potential of ethical errors by his trial counsel. See *Universal Athletic Sales Co. v. Am. Gym, Recreational & Athletic Equip. Corp*. (C.A.3, 1976), 546 F.2d 530, 539.

**{¶ 80}** The reversible errors noted above mandate a new trial; therefore, I would remand this cause to the trial court.

COOK, J., concurs in the foregoing dissenting opinion.

———————————

APPENDIX

"Proposition of Law No. 1:

"Ohio public records statute, R.C. 149.43 enables discovery of statements made by potential witnesses at a trial, and denial of this discovery by a court denies a defendant * * * due process.

"Proposition of Law No. 2:

"Where a particularized need is demonstrated by the defense for the examination of grand jury testimony the failure of the trial court to provide defense counsel with said grand jury testimony deprives a defendant of a fair trial.

"Proposition of Law No. 3:

"Absent an arrest or search warrant independent probable cause to search passengers of a vehicle is necessary even if there exists probable cause to search the driver.

"Proposition of Law No. 4:

"A trial court's dismissal for cause of jurors who express[ed] concern over recommending the death penalty but otherwise stated that they could follow the instruction of law provided by the trial court violates a defendants [sic] right to a fair and impartial jury.

"Proposition of Law No. 5:

"A trial court's failure to remove for cause jurors with a predisposition for recommending the death penalty in applicable cases violates a defendants [sic] right to a fair and impartial jury.

"Proposition of Law No. 6:

"Allowing coroner's testimony by way of someone other than the coroner who performed the autopsy denies a defendant his constitutional right to confront witnesses against him.

"Proposition of Law No. 7:

24

"By allowing a witness to testify as to the out of court statements of another a trial court commits prejudicial error and violates a defendants [*sic*] right to confront witnesses against him.

"Proposition of Law No. 8:

"The admission of expert testimony by one who is not properly qualified as an expert pursuant to Evid. R. 702 violates a defendant's due process.

"Proposition of Law No. 9:

"The introduction of a statement of a defendant prior to his being advised of his constitutional rights to remain silent violates a defendant's right against self-incrimination.

"Proposition of Law No. 10:

"A defendant is denied his right to a fair trial when a trial court improperly denies him the right to call witnesses for impeachment purposes.

"Proposition of Law No. 11:

"A conviction which is against the manifest weight of the evidence must be overturned on appeal.

"Proposition of Law No. 12:

"A defendant is denied due process of law when his conviction for a felony-murder is not supported by sufficient evidence to prove the corresponding felony offense.

"Proposition of Law No. 13:

"The introduction of gruesome photographs at trial denies a defendant the right to a fair and impartial jury.

"Proposition of Law No. 14:

"The trial court must properly charge of [sic] jury on the law and failure to do so denies a defendant the right to a fair and impartial jury.

"Proposition of Law No. 15:

"At a trial for aggravated murder with specifications, a trial court's refusal to instruct on the lesser included offenses of murder and voluntary manslaughter amount[s] to reversible error.

"Proposition of Law No. 16:

"Failure of trial counsel to preserve the record for appealable issues necessitate[s] reversal if a substantial right of the defendant has been violated.

"Proposition of Law No. 17:

"The right to effective assistance applies to an appeal as of right and the failure of appellate counsel to raise reversible assignments of error on appeal constitutes ineffective assistance of appellate counsel.

"Proposition of Law No. 18:

"Although no one error in and of itself supplies grounds for reversal, the cumulative effect of several errors can be grounds for reversing a criminal conviction.

"Proposition of Law No. 19:

"Repeated prosecutorial misconduct denies a defendant the right to a fair trial and is grounds for reversing a conviction.

"Sub-Proposition of Law No. 19(a):

"Prosecution comments on the Post-Miranda silence of a defendant amounts to prosecutorial misconduct.

"Sub-Proposition of Law No. 19(b):

"The introduction of victim impact evidence in closing arguments amounts to prosecutorial misconduct.

"Sub-Proposition of Law No. 19(c):

"A Prosecutor's arguing that the nature and circumstances of the offense were aggravating circumstances gives rise to prosecutorial misconduct.

"Proposition of Law No. 19(d):

"Prosecution comments about the defendant's exercise of his Fifth Amendment right against self-incrimination by defendant's not testifying at his trial gives rise to prosecutorial misconduct.

"Sub-Proposition of Law No. 19(e):

"A prosecutor's comment during the penalty phase of a capital case about defendant's lack of remorse gives rise to prosecutorial misconduct.

"Proposition of Law No. 20:

"The introduction of gruesome photographs during the penalty phase of trial denies a defendant the right to a fair and impartial jury.

"Proposition of Law No. 21:

"Due Process requires [that] proper instructions be given to the jury during the penalty phase of a capital case.

"Sub-Proposition of Law No. 21(a):

"A trial court must instruct the jury to consider lesser penalties than the death sentence in charging the jury after the penalty phase of a capital trial.

"Sub-Proposition of Law No. 21(b):

"Jury instructions stating that the jury's verdict after the penalty phase is only a 'recommendation' [deny] a defendant the right [to] a fair trial and an impartial jury.

"Proposition of Law No. 22:

"The right to effective assistance of counsel extends to the penalty phase of a capital trial.

"Proposition of Law No. 23:

"A trial court's preparation of its sentencing memorandum prior to the sentencing hearing denies a defendant his right to a fair trial.

"Proposition of Law No. 24:

"The cumulative effect of errors that occur during the penalty phase of a trial may deprive a defendant [of] his right to a fair trial.

"Proposition of Law No. 25:

"Failure of the prosecutor to comply with pre-trial discovery is grounds for a new trial if the thing discovered during trial prejudiced the rights of the defendant.

"Proposition of Law No. 26:

"Required proof of prior calculation and design necessary to convict aiders and abettors of a capital offense, and a lower standard for the mental state of principal offenders, denies a defendant due process and equal protection under the law.

"Proposition of Law No. 27:

"A trial court's improper weighing of aggravating circumstances with mitigating factors requires a reversal of the death penalty imposed thereunder.

"Proposition of Law No. 28:

"Imposition of the death sentence violates the Sixth, Eighth, and Fourteenth Amendments to the United States Constitution and Sections 2, 9, 10 and 16, Article I, of the Ohio Constitution.

"Sub-Proposition of Law [No.] 28(a):

"Ohio's death penalty scheme deprives defendant[s] of their lives without due process of law, denies defendants equal protection under the law[,] and imposes punishment that is cruel and unusual.

"Sub-Proposition of Law 28(b):

"R.C. Section[s] 2929.022, 2929.03 and 2929.04 violate federal and state rights to effective assistance of counsel and prohibit a defendnat [sic] from receiving a fair trial.

"Sub-Proposition of Law 28(c)

"R.C. Sections 2929.022, 2929.03 and 2929.04 are unconstitutionally vague.

"[Sub-]Proposition of Law No. 28(d):

"R.C. Sections 2929.022, 2929.03 and 2929.04 and Crim R. 11(C)(3) place unconstitutional burdens on the right to a jury trial and to be free from complusory [sic] self-incrimination.

"[Sub-]Proposition of Law No. 28(e):

"R.C. Section 2929.03 fails to provide the recommending jury with an adequate distinction between life and death sentences.

"[Sub-]Proposition of Law No. 28(f):

"Neither the Ohio Legislature nor the Ohio Supreme Court has assured adequate analysis of arbitrariness, excessiveness and disproportionality of death sentences.

"[Sub-]Proposition of Law No. 28(g):

"R.C. Section 2929.05 fails to require inquiry or findings regarding arbitrariness, passion or prejudice, and is thus unconstitutional.'"

"[Sub-]Proposition of Law No. 28(h):

"The Ohio Death Penalty requires that the jury find the death penalty appropriate punishment if mitigating factors do not outweigh aggravating circumstances thereby precluding any possibility for a mercy option."

"[Sub-]Proposition of Law No. 28(i):

"R.C. Sections 2929.03, 2929.04. and 2929.05 violate the Eight[h] and Fourteenth Amendments to the United States Constitution and Sections 9 and 16 of Article I of the Ohio Constitution by not requiring that the jury decide the appropriateness of the death penalty.

"[Sub-]Proposition of Law No. 28(j):

"The Ohio Death Penalty permits the imposition of a death sentence on less than an adequate showing of culpability.

"[Sub-]Proposition of Law No. 28(k):

"Ohio Law fails to require proof beyond a reasonable doubt that aggravating circumstances outweigh mitigating factors at the penalty phase of a trial.

"[Sub-]Proposition of Law No. 28(l):

"Basing a Death Sentence on R.C. 2929.04(A)(7) and 2929(B) denies a defendant Due Process and results in the imposition of Cruel and Unusual Punishment.

"[Sub-]Proposition of Law No. 28(m):

"The burden of proof to prove mitigation factors outweigh aggravation circumstances is unconstitutionally placed on a defendant."