[EDITOR'S NOTE: This case is unpublished as indicated by the issuing court.] OPINION
Defendant-appellant Julien L. Jackson appeals from his conviction and sentence for Aggravated Murder. Jackson contends that his right to a speedy trial was violated and, thus, the trial court erred by failing to dismiss the charge against him. He also contends that the trial court erred by failing to suppress statements he made to police as a result of an arrest without probable cause. He next claims that the trial court should have suppressed the pre-trial photographic identification made by the State's witness. Jackson also claims that the trial court erred by failing to provide him with access to the grand jury testimony and the polygraph examination results of the State's eye witness. Finally, he contends that the State improperly exercised a peremptory challenge by removing a juror solely on the basis of her race.
We conclude that Jackson executed a valid, written waiver of his right to a speedy trial. We further conclude that the police did have probable cause to arrest Jackson, based upon his identification by an eyewitness victim. Also, we find that the photographic array was not suggestive, and thus, the trial court did not err by failing to suppress the pre-trial identification. The trial court did not err by denying Jackson's request for access to the grand jury testimony and polygraph examination results. Finally, we find that the record supports a finding that the State did not use its peremptory challenge in a racially motivated manner.
The judgment of the trial court is Affirmed.
 I
On the evening of November 23, 1996, Denise Brookshire heard a noise like a gunshot behind her house. When she walked into her kitchen to investigate the noise, she was met by an armed intruder. Brookshire's young son entered the kitchen and stood behind her. Approximately thirty seconds later, a second intruder entered the house. The second man was wearing a black ski mask. The masked man took Brookshire and her son into the living room, while the first man took Brookshire's fiance, Barry Rogers, into the bathroom.
The masked man held Brookshire and her son at gunpoint. During that time, Brookshire was able to observe his eyes, nose and mouth at close hand for what she described as a "long time." The masked man then told Brookshire to get on the couch. She knelt down and placed her head on the couch, while holding her son. The masked man held the gun to the back of her head. At some point, the masked man left the room, and Brookshire and her son hid in a closet and called 911. While in the closet, Brookshire heard the men "rustling" around and talking. Brookshire and her son remained in the closet until found by the police.
Brookshire testified that she heard a bang, like a gunshot, while the men were in the house. However, she could not recall whether she heard it while she was standing against the wall or after she had her head on the couch. Rogers was killed by a gunshot wound to the head.
Four days later, Brookshire met with the police. At that time, she informed them that the masked man was Jackson. She personally knew Jackson, whom she described as her cousin's fiance, and she had been around him on several occasions. Subsequently, the investigating officers located Jackson's residence. When they arrived at the residence, Jackson's mother invited the officers into the home. She escorted the police into Jackson's bedroom, where he was asleep. When Jackson awoke, the officers requested that he accompany them downtown to the Safety Building to talk with them. According to the officers, Jackson was very cooperative.
The officers took Jackson into a conference room where they read, and explained, a pre-interview form to him that set forth his rights pursuant to Miranda v. Arizona (1966), 384 U.S. 436. As each of his rights were read to him, Jackson verbally responded that he understood the right, and signed his initials beside each right as listed on the form. Jackson then signed the form, indicating that he waived his rights under Miranda. He also indicated on the form that he had completed more than thirteen years of school.
Jackson was charged by complaint with Aggravated Murder on December 1, 1996. On December 4, 1996, he waived a preliminary hearing and was bound over to the Common Pleas Court. On December 30, 1996, he and his attorney executed a waiver of Jackson's speedy trial rights. Subsequently, on October 7, 1997, Jackson was indicted for Aggravated Murder, Aggravated Robbery, Aggravated Burglary and Tampering with Evidence. On November 17, 1997, he filed a motion to dismiss the charges on the grounds that the State had violated his right to a speedy trial. The State claimed that the execution of the waiver precluded a dismissal on speedy trial grounds. The trial court, however, found that the waiver was only applicable to the Aggravated Murder charge, not to the charges brought after the speedy trial waiver was executed. Therefore, the trial court discharged Jackson of all charges except Aggravated Murder. The State appealed from this decision, and Jackson cross-appealed. We upheld the trial court's decision. State v. Jackson (Sep. 30, 1998), Montgomery App. No. 17056, unreported.
The case proceeded to trial on May 11, 1998. Jackson was convicted of Aggravated Murder and sentenced accordingly. From his conviction and sentence, Jackson appeals.
 II
Jackson's First Assignment of Error is as follows:
 THE LOWER COURT ERRED IN FAILING TO DISMISS THE AGGRAVATED MURDER CHARGE BECAUSE OF A VIOLATION OF APPELLANT'S STATUTORY AND CONSTITUTIONAL RIGHTS TO A SPEEDY TRIAL. THE SPEEDY TRIAL TIME WAIVER THAT HAD BEEN SIGNED BY APPELLANTS [SIC] WAS INVALID SINCE IT HAD NOT BEEN KNOWINGLY EXECUTED BY APPELLANT.
Jackson contends that the trial court should have dismissed the charge of Aggravated Murder because the State violated his statutory and constitutional right to a speedy trial.
In discussing the right to a speedy trial, the Tenth District Court of Appeals has stated:
 The right to a speedy, public trial is guaranteed to every person who is charged with an offense for which he may be deprived of his liberty or property. The Sixth Amendment to the United States Constitution; Section 10, Article I, Ohio Constitution. A defendant's right to a speedy trial is codified in R.C. 2945.71, which was enacted as " * * * a rational effort to enforce the constitutional right to a public speedy trial of an accused charged with the commission of a felony or a misdemeanor and shall be strictly enforced by the courts of this state."
 R.C. 2945.71(C)(2) provides that a defendant against whom a felony is pending must be brought to trial within two hundred seventy days of his arrest. Each day an accused is held in jail in lieu of bail on a pending charge is counted as three days. R.C. 2945.71(E). These statutory provisions are mandatory and require compliance by both the trial court and the state. Once a defendant demonstrates that two hundred seventy days have expired, a prima facie case for discharge is established. The state then bears the burden of proving the time was extended or tolled under R.C. 2945.72 so that the defendant will be tried in less than the statutory limit. If the accused is not brought to trial within the statutory time limit, the defendant is discharged as a matter of law. R.C. 2945.73(B).
 The standard of review in speedy trial cases is simply to count the days as directed in R.C. 2945.71 et seq. The date of arrest is not included in speedy trial computation.
State v. Carter (Mar. 31, 1998), Franklin App. No. 97APA08-976, unreported.
In this case, Jackson was arrested on November 29, 1996. Thus the speedy trial time began to run on November 30. Clearly, Jackson was not brought to trial within the statutory time limit. In fact, he was not tried for more than five hundred days after his arrest. Thus, he has established a prima facie case for discharge.
However, both Jackson and his attorney executed a waiver of his right to a speedy trial. "It is well-settled law that an accused may waive his constitutional right to a speedy trial provided that such a waiver is knowingly and voluntarily made."State v. Malott (May 1, 1998), Montgomery App. No. 16853, unreported. Jackson contends that the waiver was not made knowingly and voluntarily because it: (1) was not executed in open court; (2) was of unlimited duration; and (3) "appears" to have been signed as a condition precedent to plea negotiations, thereby coercing him into executing the waiver. We find these arguments unpersuasive.
First, Jackson admits that there is no requirement that such a waiver be made in open court. In fact, in Ohio, a waiver of speedy trial rights may be "expressed in writing or made in open court on the record." State v. King (1994), 70 Ohio St.3d 158, syllabus. Jackson expressly executed a waiver in writing, which was filed of record on December 30, 1996.
Second, waivers of unlimited duration are accepted by Ohio courts. See, e.g., State v. O'Brien (1987), 34 Ohio St.3d 7. Jackson, though, contends that had he or his attorney known how long it would take to get to trial, they would not have signed a waiver of unlimited duration. Thus, he claims that they did not execute the waiver with full knowledge. After a hearing on the issue, the trial court found that the waiver was knowledgeably and voluntarily executed. We find that the evidence supports the finding of the trial court.
Furthermore, the mere fact that Jackson did not anticipate the length of the delay does not render the waiver unenforceable. This claim, if accepted, would render any waiver of unlimited duration unenforceable as being executed without knowledge. Since a defendant has the right to file a written objection to further continuances and to demand a trial date, thereby prospectively revoking his waiver, he has the ability to limit the duration of the waiver.
Finally, Jackson claims that it "appears" that the State would not enter into plea negotiations with him until he executed the waiver, thereby effectively coercing him into signing the waiver. It does appear that the State, after being approached by Jackson's attorney regarding plea negotiations, requested that he sign a waiver. However, there is no indication that the State conditioned plea negotiations upon the signing of the waiver.[1] Instead, the record reveals testimony to indicate that Jackson understood that his attorney "wanted him to sign the time waiver so that [he] could have additional time to explore the very real possibility of a plea bargain * * * [and] to ensure that [his co-defendant's] case would go to trial before [Jackson's]." Furthermore, the record reveals evidence that at the time Jackson signed the waiver, "he was aware that [his attorney] was in the process of negotiating * * * with respect to a plea bargain * * *". Also, as previously noted, the trial court, after conducting a hearing, found that Jackson's waiver was voluntary. Again, we conclude that the evidence supports the trial court's conclusions.
The record supports a finding that Jackson executed a waiver of his speedy trial rights, and that the execution was both voluntary and knowledgeable. Therefore, his First Assignment of Error is overruled.
 III
For his Second Assignment of Error, Jackson states:
 THE LOWER COURT ERRED IN FAILING TO SUPPRESS THE APPELLANT'S STATEMENTS/CONFESSION MADE TO THE POLICE BECAUSE, EVEN THOUGH THE POLICE HAD ADVISED THE APPELLANT OF HIS MIRANDA RIGHTS, HE WAS FIRST ARRESTED AND HELD WITHOUT PROBABLE CAUSE PRIOR TO MAKING ANY STATEMENTS.
Jackson contends that his statement, or confession, should have been suppressed. He argues that suppression was required because the statements were only made after the police "essentially" arrested him without probable cause.
Jackson argues that the police did not have probable cause to arrest him because at the time Brookshire identified him as a perpetrator, the police had no other information implicating him in the commission of the crime. He also argues that the following factors, which he claims rendered Brookshire's identification of him unreliable, preclude a finding that the police had probable cause for the arrest: (1) Brookshire described the perpetrator as having certain physical characteristics that Jackson apparently did not have; i.e., a scar on his lower back, and "something wrong with his leg;" (2) despite the fact that Jackson has a readily apparent scar on his nose, Brookshire failed to tell the police about it; (3) a discrepancy existed between Brookshire's initial statement that the masked man was muscular and a later statement that he had a "pudgy belly" and a "heavy build;" and (4) Brookshire submitted to a polygraph examination, the results of which were inconclusive.
Probable cause for the arrest of an individual does not "require proof beyond a reasonable doubt, but must be based upon something more than unfounded suspicions or inarticulable hunches." Katz, Ohio Arrest, Search Seizure (1997 Ed.), at 69, citing, Beck v. Ohio (1964), 379 U.S. 89. In Ohio, probable cause for arrest exists when a prudent person would believe, based on information from a reasonably trustworthy source, that the individual to be arrested has committed a crime. State v. Timson
(1974), 38 Ohio St.2d 122. "[A] tip from an identified citizen informant who is a victim or witnesses a crime is presumed reliable, particularly if the citizen relates his or her basis of knowledge." State v. Gress (June 19, 1998), Montgomery App. No. 16899, unreported, citations omitted.
In determining whether probable cause existed in this case, we must note that there is no dispute that Brookshire was acquainted with Jackson. Furthermore, she positively identified Jackson as one of the robbers. The mere fact that she may have incorrectly described some physical characteristics or waited four days to name him is not unreasonable given the traumatic nature of the event, in which her fiancé was murdered. While the factors listed by Jackson are an appropriate topic for cross-examination on the issue of proof of guilt beyond reasonable doubt, we conclude that they do not preclude the trial court's determination that probable cause existed.
We also address the issue of whether Jackson's statements to the police were involuntarily made. In determining whether a defendant's confession is voluntary, a court "should consider the totality of the circumstances, including the age, mentality, and prior criminal experience of the accused; the length, intensity, and frequency of interrogation; the existence of physical deprivation or mistreatment; and the existence of threat or inducement." State v. Brewer (1990), 48 Ohio St.3d 50, 58.
We conclude that the trial court did not err by failing to suppress the statements made by Jackson. The record supports a finding that he was advised of his rights before signing the voluntary waiver form. The record also supports a finding that there was no police coercion in the form of physical deprivation or mistreatment or the use of threats. Furthermore, there is no evidence that Jackson cannot read and write, or that he has any intellectual limitations. In fact, after giving his oral statements, Jackson prepared and signed a written statement. The record supports a finding that Jackson understood that he did not have to talk to the police, and that he did not ask for an attorney. Moreover, the record supports a finding that Jackson readily cooperated with the police, even to the point of helping devise a plan to apprehend his co-defendant.
Given that the police had probable cause to arrest Jackson, and that his statements were not involuntarily made, we conclude that the trial court did not err in failing to suppress his confession. Accordingly, his Second Assignment of Error is overruled.
 IV
Jackson's Third Assignment of Error proposes:
 THE LOWER COURT ERRED IN NOT SUPPRESSING THE PHOTO SPREAD IDENTIFICATION OF THE APPELLANT BY WITNESS MILDRED BROOKSHIRE.
Jackson contends that the trial court erred by failing to suppress the pre-trial identification made by Brookshire from a photo array. He argues that the identification was tainted by the following: (1) Jackson was not "wearing a mask as the perpetrator was during the crime;" (2) the witness had "likely" been told that Jackson was in custody prior to picking him out of the photo spread; and (3) the photograph used was obtained as a result of an arrest made without probable cause.
In State v. White (Feb. 2, 1994), Clark App. No. 3057, unreported, this court addressed the issue of suggestive photographic confrontations:
 In many cases, and in almost all cases in which the criminal offender is not known to his victim or other eyewitnesses and is not arrested at the time of the crime, those who witness the crime are asked to identify the perpetrator for purposes of police investigation through some form of confrontation. This confrontation may be in the form of a "lineup", a one-on-one "show up", or from a photograph or series of photographs displayed to the witness. When any of these systems of confrontation suggest, due to the manner or mode of their presentation, that one individual is more likely than others to be the perpetrator of the crime, that fact increases the likelihood of misidentification and violates the right to due process of law of a defendant so identified. Identification testimony that has been tainted by an unduly or unnecessarily suggestive out-of-court confrontation may be suppressed on that basis.
 However, even when a confrontation is unnecessarily or unduly suggestive, the identification testimony derived from the confrontation is not inadmissible solely for that reason. Reliability of the testimony is the linchpin in determining its admissibility. So long as the identification possesses sufficient aspects of reliability, there is no violation of due process.
 Reliability is determined from the totality of the circumstances. These circumstances include the opportunity of the witness to view the criminal at the time of the crime, the witness' degree of attention, the accuracy of his prior description of the criminal, the level of certainty demonstrated at the confrontation, and the time between the crime and the confrontation. Against these factors is to be weighed the corrupting effect of the suggestive identification itself.
 The foregoing due process concerns are implicated only if and when a confrontation is unnecessarily or unduly suggestive. That prospect usually arises when the witness has been shown but one subject, whether in a "showup" * * * or a single photograph * * *. Similarly, if the witness is shown pictures or photographs of several persons in which the photograph of one recurs or is in some way emphasized, undue suggestion may occur. However, even when the confrontation process is unduly or unnecessarily suggestive, the later identification testimony should not be excluded so long as the identification itself is reliable.
Id., citations omitted.
Jackson's claim that the witness was "likely" told that he was in custody prior to picking him out in the array is not supported by the record. Also, his claim that he was arrested without probable cause is without merit. Even if this claim were true, it would not have had any effect upon the photo array. We also find without merit Jackson's claim that he was prejudiced because the photo array did not depict him in a mask. The record reveals that Brookshire's photo identification of Jackson was merely corroborative of her previous statement to the police that she recognized Jackson as one of the perpetrators in the crime based upon her personal acquaintance with him. In other words, Brookshire's initial identification of Jackson as one of the robbers was not predicated upon seeing his picture in a photo array.
We have viewed the photographic array. We find nothing to suggest that the array itself is unduly suggestive. It consists of pictures of six black males who appear to be about the same age and build. All of the subjects have similar short hair cuts and similar facial hair. There is nothing about the array that is even slightly suggestive, let alone unduly suggestive. In fact, we find this photo array to be exemplary because of the apparent care taken to create a line-up composed of individuals who are similar in appearance.
Even had the array been unduly suggestive, the circumstances of this case indicate that Brookshire's identification of Jackson was itself sufficiently reliable. Therefore, we cannot say that the trial court erred by permitting the State to introduce evidence of Brookshire's pre-trial identification of Jackson.
Jackson's Third Assignment of Error is overruled.
 V
Jackson's Fourth Assignment of Error states:
 THE LOWER COURT ERRED IN NOT PROVIDING THE APPELLANT WITH THE GRAND JURY TESTIMONY OF MILDRED BROOKSHIRE.
Jackson contends that the trial court erred by overruling his request for access to the transcript of Brookshire's grand jury testimony. In his motion for disclosure, Jackson argued that he needed the material for purposes of cross-examination and possible impeachment of Brookshire.
"Crim.R. 6(E) controls the disclosure of grand jury testimony." State v. Mack (1995), 73 Ohio St.3d 502, 508. "In general, proceedings before a grand jury are secret, and `an accused is not entitled to inspect grand jury transcripts either before or during trial unless the ends of justice require it and there is a showing by the defense that a particularized need for disclosure exists which outweighs the need for secrecy." State v.Towns (Aug. 29, 1996), Franklin App. No. 95APA11-1496, unreported, quoting, State v. Greer(1981), 66 Ohio St.2d 139, paragraph two of the syllabus. A "particularized need" is shown "when the circumstances reveal a probability that the failure to disclose the grand jury testimony will deny the defendant a fair trial."Id.
As noted, Jackson contends that the transcript was needed in order to impeach Brookshire during trial. His request was based on his contention that Brookshire had made inconsistent statements on previous occasions, could not "give a chronological order to how the events occurred," and was "inclusive" [apparently, "inconclusive" is the intended word] on the polygraph examination. Therefore, he contends that the grand jury testimony would either be consistent with her prior statements, inconsistent with her prior statements, or "possibly inconsistent altogether."
"The general contention that a witness' grand jury testimony might aid in impeaching his courtroom testimony does not outweigh the state's interest in keeping the grand jury proceedings secret." State v. Pratt (Oct. 8, 1997), Summit App. No. 18044, unreported, citing State v. Mack, supra, at 508. "[A] bald assertion on appeal that [the defendant] needed to examine the testimony of an adverse witness for inconsistencies fail[s] to set forth a particularized need." State v. Mack, at 508. "When a defendant `speculates that the grand jury testimony might have contained material evidence or might have aided his cross-examination * * * by revealing contradictions,' the trial court does not abuse its discretion by finding the defendant had not shown a particularized need." Id., quoting State v. Webb
(1994), 70 Ohio St.3d 325, 337. If the use of grand jury testimony were permitted simply because a defendant claims that the prior statements of a witness could be used for impeachment purposes, virtually all grand jury testimony would be subject to disclosure." State v. Cherry (1995), 107 Ohio App.3d 476, 479.
We conclude that the trial court did not abuse its discretion in denying Jackson's petition. The record supports the trial court's finding that Jackson made no showing of a particularized need for the testimony. Furthermore, Jackson had been provided with all prior statements made by Brookshire to the police. Thus, Brookshire was subject to cross-examination in regard to her statements at both the suppression hearing and trial. Therefore, Jackson was capable of bringing any inconsistencies in Brookshire's testimony and statements to the attention of the jury.
Jackson's Fourth Assignment of Error is overruled.
 VI
Jackson's Fifth Assignment of Error is as follows:
 THE LOWER COURT ERRED IN FAILING TO ORDER THE PROSECUTOR TO PROVIDE INFORMATION FROM THE ONLY EYEWITNESS'S INCLUSIVE [SIC] POLYGRAPH EXAMINATION.
Jackson contends that the trial court erred in denying his request seeking access to information regarding the polygraph examination of Brookshire. Specifically, he sought a copy of the questions asked during the examination, the pre-test interview and the chart showing the results. In support, he claims that he was entitled to disclosure pursuant to Crim.R. 16(B)(1)(f) and Bradyv. Maryland (1963), 373 U.S. 83.
We begin by noting that in Ohio, "[t]he results of polygraph tests of prospective prosecution witnesses were found to not be discoverable * * * as exculpatory evidence under Brady inState v. Davis (1991), 62 Ohio St.3d 326, 341." State v. Buhrman
(Sep. 12, 1997), Greene App. No. 96 CA 145, unreported. Moreover, the U.S. Supreme Court has held that polygraph results are not discoverable under Brady, and that the failure to turn over the result of an examination does not constitute a discovery violation. Id., citing, Wood v. Bartholomew (1995), 516 U.S. 1.
Crim.R. 16(B)(1)(f) requires the disclosure of all evidence favorable to the defendant that is material to guilt or punishment. Evidence is material only if its suppression undermines confidence in the outcome of the trial by creating a reasonable probability that had the evidence been disclosed the result of the proceeding would have been different. United Statesv. Bagley (1985), 473 U.S. 667, 682. The Ohio Supreme Court adopted this materiality test in State v. Johnston (1988), 39 Ohio St.3d 48,61.
Jackson contends that since the polygraph results were deemed inconclusive, another polygraph expert might conclude that Brookshire lied during the examination. He further argues that this information would have aided in fashioning a cross-examination of the witness at trial. Essentially, Jackson argues that he could have impeached Brookshire during trial had he been given access to material that might have shown that she was not truthful. We find this argument too speculative to give rise to a claim that the exam results were material. Moreover, given Jackson's voluntary confession to his role in the crime, we cannot conclude that discovery of the polygraph results would have led to a different outcome at trial.
Jackson's Fifth Assignment of Error is overruled.
 VII
Jackson's Sixth Assignment of Error provides:
 THE LOWER COURT ERRED IN PERMITTING THE PROSECUTION TO EXERCISE A PEREMPTORY CHALLENGE TO REMOVE AN AFRICAN-AMERICAN FROM THE JURY LEAVING ONLY ONE OTHER AFRICAN-AMERICAN JUROR. AS SUCH, THIS CONSTITUTED A VIOLATION OF THE EQUAL PROTECTION CLAUSE OF THE FOURTEENTH AMENDMENT TO THE UNITED STATES CONSTITUTION.
Jackson contends that the trial court erred in overruling his objection to the State's use of a peremptory challenge to remove an African-American juror. In support, he argues that the prosecutor had no reason to remove the juror, aside from her race.
The voir dire colloquy between the prosecutor and the juror is as follows:
Prosecutor: * * * You work with Aetna?
Juror: Yes. It's a little office, only two hours.
Prosecutor: You work two hours a day?
Juror: Yeah.
Prosecutor: Aetna, is that the insurance company?
 Juror: No. It's like a maintenance thing. I only work two hours in the office.
 Prosecutor: Okay. And does the company you work for, they provide maintenance service for homes or buildings?
 Juror: I really don't know. I work in multi-media in NCR.
 Prosecutor: Oh. Aetna provides you with the job to go to and your job is to go to NCR?
Juror: Right.
 Prosecutor: Okay. That's fine. And what time of the day do you normally go to work?
Juror: 11:00 to 1:00.
Prosecutor: Is that 11:00 in the evening?
Juror: In the morning, just two hours.
 Prosecutor: Okay. In other works, now it's 11:15. You would otherwise — you would be at work?
Juror: Yes.
 State: Okay. But there's no difficulty in your being here this week?
Juror: No, it's no problem.
 Prosecutor: Do you plan to go to work after you leave the courtroom?
Juror: No. I'll go home.
After the State used a peremptory challenge against the juror, the following discussion took place in chambers:
Defense: Your Honor, may I ask why [this juror]?
Court: Are you raising a Batson challenge?
Defense: Yes, I am.
Court: Mr. Slavens?
 Prosecutor: We've examined the questionnaire and she is 75 years old. When I was questioning her, she talked about her employer and then I remember her going off into a different area that I didn't follow and understand, and then she works for two hours a day. I could not understand what the lady was reporting about her work situation, Your Honor. I do know she's not going to go to work at night.
 And then she talked about another place of employment and I was confused from her answers, and I'm confused as to whether or not she can follow real lengthy testimony that's going to be in this case.
Court: Mr. Popp?
 Defense: Your Honor, as I recall, she was not examined that much about her work. I didn't have any trouble understanding that she worked for two hours, from 11:00 to 1:00. Being 75 years old, I'm not sure that's a criteria for excuse. She's not said anything about any health problems, you know, going with her age would cause her not to be able to be fair and impartial. In fact, I believe one of the few questions that Mr. Slavens asked her, the last one, if there was any reason why she couldn't sit on this jury and be fair and impartial, and she said, "No, there is no reason why,"
In Batson v. Kentucky (1986), 476 U.S. 79, the United States Supreme Court limited the use of peremptory challenges to prevent challenges made solely on the basis of race. In analyzing the defendant's claim that the State violated Batson in making its challenge, the following tripartite test must be followed:
 First, the defendant must make a prima facie showing that the prosecutor has exercised peremptory challenges on the basis of race. Second, if the requisite showing has been made, the burden shifts to the prosecutor to articulate a race-neutral explanation for striking the jurors in question. Finally, the trial court must determine whether the defendant has carried his burden of proving purposeful discrimination.
Hernandez v. New York (1991), 500 U.S. 352, citations omitted.
Defense counsel's attempt to make a prima facie showing that Davidson was challenged on the basis of her race apparently rests on the fact that she was challenged and she is black. We need not consider whether the defense made a prima facie showing of racial discrimination. "Once a prosecutor has offered a race-neutral explanation for the peremptory challenges and the trial court has ruled on the ultimate question of intentional discrimination, the preliminary issue of whether the defendant has made a prima facie showing becomes moot." State v. Brock (1996), 110 Ohio App.3d 656,668, quoting Hernandez, supra. In this case, defense counsel objected, the prosecutor offered an explanation, and the trial court ruled on the issue. Therefore, we will assume that Jackson has met the first prong of Batson, and proceed to the second.
We have noted that the "race-neutral explanation offered by the prosecutor need not rise to the level of a challenge for cause," nor need it even be compelling, "persuasive or plausible."State v. Nobles (1995), 106 Ohio App.3d 246, 280, citingHernandez, supra. Instead, "the issue is the facial validity of the prosecutor's explanation." Id., citations omitted. "Unless a discriminatory intent is inherent in the prosecutor's explanation, the reason offered will be deemed race neutral." Id., citations omitted.
From the record, we find no racially discriminatory intent inherent in the prosecutor's explanation. Therefore, "we proceed to review step three, in which the court weighed the merits of [Jackson's] challenge against the state's race-neutral explanation, and made a factual determination that [Jackson], the opponent of the strike, had failed to carry [his] burden of proving discriminatory intent." Nobles, at 280.
Although the trial court did not make any factual findings regarding the challenge, it did summarily overrule Jackson's objection. Therefore, we may presume that the trial court found that the State did not exercise its peremptory challenges with a racially discriminatory intent. A "trial court's determination as to intent "largely turn[s] on evaluation of credibility."Nobles, at 281, quoting Batson, supra, at 98. Therefore, the "trial court's determination is to be accorded great deference, and will not be disturbed on appeal unless, based on the record, it is clearly erroneous." Id., quoting Hernandez, supra.
The prosecutor, based upon his apparent confusion regarding Davidson's voir dire testimony, indicated that he thought Davidson, who was 75 at the time, would have difficulty following testimony. This is a legitimate concern. Furthermore, as Jackson concedes, the State had two challenges remaining, but left the remaining black juror on the jury as finally constituted.
We cannot find from the record before us that the trial court erred in overruling Jackson's objection to the State's use of its peremptory challenge. Accordingly, the Sixth Assignment of Error is overruled.
 VIII
All of Jackson's Assignments of Error being overruled, the judgment of the trial court is Affirmed.
GRADY, P.J., and YOUNG, J., concur.
Copies mailed to:
George A. Katchmer
Vincent P. Popp
Hon. Jeffrey Froelich
[1] Because the State is not required to plea bargain, i.e.,
a defendant has no right to a plea bargain, we entertain some doubt whether Jackson is correct in his premise that the State may not use its agreement to enter into plea negotiations as an inducement to obtain a waiver of the defendant's speedy trial rights. We need not, and do not, decide that question here.