THE STATE OF OHIO, APPELLEE, *v.* PATTERSON, APPELLANT.

[Cite as State v. Patterson (1971), 28 Ohio St. 2d 181.]

(No. 71-59—Decided December 29, 1971.)

*Mr. Robert E. Mohler,* prosecuting attorney, and *Mr. Stephan M. Gabalac,* for appellee.

*Mr. Michael D. Baker, Mr. W. Dick Coombs* and *Mr. Robert K. Lewis, Jr.,* for appellant.

O'NEILL, C. J.   Prior to trial, counsel for appellant moved for discovery of "all exculpatory evidence contained in the files of the prosecutor or personally known to" him, which counsel had no "way of knowing about."   In support of this motion, counsel cited *Brady* v. *Maryland* (1963), 373 U. S. 83.   The prosecutor objected, and the trial court, without inquiry, denied the motion.   Appellant contends that this ruling denied him due process of law.

*Brady, supra,* at page 87, holds that " * * * the suppression by the prosecution of evidence favorable to an accused upon request violates due process where the evidence is material either to guilt or to punishment * * *." At the time the motion was made, counsel had no knowledge of any exculpatory evidence held by the prosecutor.   This fact is immaterial, for that was precisely why the motion was made.   It was incumbent upon the trial court to determine if there was evidence favorable to the accused which was material to either guilt or punishment.

In oral argument before this court, the prosecutor was asked, on his professional honor, if he knew of any evidence favorable to appellant that had been concealed.   He answered in the negative.   Counsel for appellant was also asked the same question, and he, too, responded in the negative.   Other than an examination of the prosecutor's files, no more than this could have been done by the trial court to satisfy *Brady.*   This question to both counsel by the trial court would have been sufficient to satisfy *Brady.*

The failure of the trial court to proceed as indicated,

however, can not be made the basis for a reversal in the instant case because the responses of the prosecutor and defense counsel to this court's questions are sufficient to satisfy us that in fact no exculpatory evidence existed.[1]

Appellant contends that the trial court erred in refusing to allow him, prior to cross-examination, an *in camera* inspection of the grand jury testimony of Dorothy Johnson, the state's principal witness. The thrust of his argument is that her testimony at trial was inconsistent with that in her deposition and, therefore, he was entitled, under the rule announced in *State* v. *White* (1968), 15 Ohio St. 2d 146, to inspect her grand jury testimony.

When Patterson was arrested the police found a green army jacket in his apartment and a .22 caliber revolver in his car. When Wesby (an accomplice) was arrested, the police found a blue jacket, with a .25 caliber Berretta in the pocket. The bullet which killed the victim was fired from the Berretta. Neither gun contained any identifiable fingerprints.

At trial, on direct examination, Dorothy Johnson testified that the shorter man with the green jacket, the soft voice and the Afro hairstyle (Wesby) was the one who stood next to her; that the taller man with the blue jacket, the deeper voice and with "hardly no hair on his head" (Patterson) stood over by the victim. She could not, however, testify as to which of the two men shot the victim, because shortly after forcing her to kneel, face down, Wesby moved away from her.

In the deposition, her testimony was substantially the same. The only inconsistency was in her description of the color of the jackets worn by the two men. She stated

---

[1]Code of Professional Responsibility, 23 Ohio St. 2d 47, DR 7-103(B).

"A public prosecutor * * * in criminal litigation shall make timely disclosure to counsel for the defendant, or to the defendant if he has no counsel, of the existence of evidence, known to the prosecutor * * * that tends to negate the guilt of the accused, mitigate the degree of the offense, or reduce the punishment."

that "the tall one [wore] a yellow jacket or a white jacket, and the shorter one had on an army jacket, that green jacket * * *."[2] It was the theory of the prosecutor that the two men, after the robbery, exchanged both jackets and weapons.

Paragraph three of the syllabus in *State* v. *White,* *supra,* states:

"Where the state's principal witness admits in open court that her testimony is inconsistent with some or all of her prior *statements to the police* * * * the trial court must grant a request by defense counsel to inspect the statements." (Emphasis added.)

Appellant's reliance on *White* is misplaced. Counsel sought her grand jury testimony because of an inconsistency between her trial testimony and her deposition and not because of a prior inconsistent statement made to the *police.* The *White* case is silent on discovery of grand jury testimony because of prior inconsistent statements made by the principal witness.

However, we do not rest our determination on that distinction alone. The witness demonstrated to the satisfaction of the court that her recollection at trial of a blue jacket was made independently of any improper influence by the prosecutor.[3] The evidence also showed that on the

---

[2]The accuracy of Dorothy Johnson's testimony was important for two reasons. First, the defense was conducted on the theory of alibi. Counsel presented two witnesses who testified that they saw the appellant during the time in question at places other than the scene of the crime. Second, counsel attempted to persuade the jury that it was not Patterson who was the "triggerman," and therefore they should extend mercy if they did not believe his alibi.

[3]Shortly before trial the witness spoke with the prosecutor and the police officer to whom she had made the oral statement. Referring to this officer, the prosecutor asked:

"Q And when you saw that police officer did that remind you of anything?

"A Yes, it reminded me of the blue jacket.

"Q Why * * *?

"A Because I remember telling him of the blue jacket.

"Q And was there any solicitation from me or any coaching from me?

day of the robbery she generally identified the participants and stated that the tall one wore a blue jacket. The following day she gave a written statement in which she identified the taller man as wearing the blue jacket.[4] Immediately after making this statement, and without any prior knowledge that a line-up was to be conducted, she properly identified both men at a line-up. At trial, she made an in-court identification of Patterson. The prosecutor also presented another witness who placed Patterson at the scene of the crime just minutes before it occurred. This witness had been out "socially" with Patterson on numerous occasions. She testified that on the day of the robbery he was wearing a blue jacket.

The rule stated in *State* v. *Laskey* (1970), 21 Ohio St. 2d 187, 191, is applicable here:

"* * * Generally, proceedings before a grand jury are secret and an accused is not entitled to inspect grand jury minutes before trial [nor at trial] * * *. This rule is relaxed only when the ends of justice require it, such as when the defense shows that a particularized need exists for the minutes which outweighs the policy of secrecy."

See, also, *Dennis* v. *United States* (1966), 384 U. S. 855; *Pittsburgh Plate Glass Co.* v. *United States* (1959), 360 U. S. 395, rehearing denied, 361 U. S. 855; *United States* v. *Procter & Gamble Co.* (1958), 356 U. S. 677. Cf. *In re Klausmeyer* (1970), 24 Ohio St. 2d 143.

Against the overwhelming evidence presented at the trial placing Patterson at the scene of the crime, this one inconsistency is not a particularized need which outweighs the policy of secrecy of grand jury proceedings.

Disclosure of the grand jury testimony would not as-

"A No, not at all.
"Q You did this on your own?
"A On my own.
"Q And you told me at that * * * time [that it was a blue jacket], is that correct?
"A Right."
[4]A copy of this statement was voluntarily given by the prosecutor to counsel during the cross-examination of Dorothy Johnson.

sist in determining who was the "triggerman." At trial, the witness testified that she did not see which of the two men actually shot the victim. This testimony was consistent with that in her deposition. There was no showing of inconsistency on this point, nor was the testimony harmful to appellant. Thus, with respect to both arguments concerning the denial of the motion for production of the grand jury transcript, we find no prejudicial error.

Appellant contends that three veniremen were improperly excused for cause, contrary to the requirements of *Witherspoon* v. *Illinois* (1968), 391 U. S. 510; *Boulden* v. *Holman* (1969), 394 U. S. 478; and *Maxwell* v. *Bishop* (1970), 398 U. S. 262. The essence of his contention is that "the [trial] court * * * systematically excluded all jurors who had scruples or reservations concerning the death penalty." These veniremen, according to appellant, "expressed opposition to capital punishment, but did not entirely rule it out of consideration * * *. None unambiguously ruled out death."

This court has recently examined the combined effect of *Witherspoon, Boulden* and *Maxwell, supra,* in *State* v. *Watson* (1971), 28 Ohio St. 2d 15. In the third paragraph of the syllabus, it is stated:

"In selecting the members of a jury, unless a venireman states unambiguously that he would automatically vote against the imposition of capital punishment no matter what the trial might reveal, it cannot be assumed that this is his position."

Emmons, J., conducted the *voir dire* examination of the veniremen in the instant case in an excellent manner. The seating of the jury in this case can well serve as a model for trial judges in this state in future capital cases.

The pertinent parts of the *voir dire* examination of the veniremen in the instant case are given below to illustrate the care that was exercised by the trial court to select an impartial jury, as required by *Witherspoon, Boulden* and *Maxwell, supra.*

Venireman Fulst stated that "in a way" he was op-

posed to capital punishment; that "I don't think I would like to cause a man to give his life." Additional questions and answers were as follows:

"Q [by prosecutor] You don't think you could send him to his death?

"A No.

"Court: Under any circumstances you could not return such a verdict?

"A I don't think so.

"Court: Could you or couldn't you?

"A No.

"* * *

"Court: * * * under no circumstances could you * * *?

"A No."

Venireman Fedrick, in response to the question of opposition to capital punishment, answered: "I really don't know whether I am or not." Continued questioning elicited these answers:

"A * * * but I just don't see where any man has the right to say that another man is guilty and should be executed.

"A I * * * could pass * * * judgment * * * [on guilt or innocence], but if it meant * * * that the man would have to be executed, it would be a different story.

"* * *

"A I don't think I should determine what the penalty should be.

"* * *

"Court: But you have to go farther than that [determining guilt or innocence].

"A I know.

"Court: * * * and you tell me that under no circumstances could you return a verdict sending this man to death * * *?

"A Not as the circumstances stand now, no, I couldn't."

It is clear that veniremen Fulst and Fedrick were opposed to capital punishment, that they could not make

their beliefs subservient to their oath as a juror, and that they could not consider all of the penalties provided by law. Their answers to the questions propounded by both court and counsel show that they did unambiguously rule out death. They were properly excused for cause.

Venireman Llewellyn at first stated that she was not opposed to capital punishment, that she did not "know" whether she could vote for death. Further questions and answers were as follows:

"Q * * * if * * * the facts and circumstances justify the return of a verdict carrying with it the death penalty, could you vote for that verdict * * *?

"A No, I don't think I could.

"Q You could not?

"A (Shakes head.)

"Q Under no circumstances?

"A No."

Venireman Dunn was opposed to capital punishment "to some degree," and did not "think" he could return a verdict carrying with it the death penalty. He did state that he would follow the law as the court would define it. However, after being asked 16 times whether he could return a verdict carrying with it death, the best answer he gave was, "I don't think I could." Dunn was seated and later excused on a peremptory challenge by the prosecutor.

Appellant argues that venireman Dunn "had substantially the same doubts as * * * [venireman] Llewellyn" and as he was not excused, neither should she have been excused. Appellant's analogy is incorrect. Venireman Llewellyn, at one point indicated she did not "think" she could return the death penalty, but later stated that under no circumstances could she return such a penalty.

Venireman Dunn, never changed his position. Evidently the trial court had a doubt whether Dunn would automatically vote against the death penalty. A reading of the *voir dire* examination bears out this conclusion. The demeanor and sincerity of the veniremen are better judged by the trial court and, on appeal, a ruling will not be dis-

turbed unless clearly erroneous. The trial court properly seated Dunn, because it could not assume that he would automatically vote against the death penalty.[5] Venireman Llewellyn, was properly excused for cause for the same reasons veniremen Fulst and Fedrick were dismissed.

Appellant has claimed a number of other errors. However, a careful examination of the record reveals them to be without merit.

For the foregoing reasons the judgment of the Court of Appeals is affirmed.

*Judgment affirmed.*

HERBERT, CORRIGAN, STERN and LEACH, JJ., concur.[6]

SCHNEIDER, J., concurs in paragraphs three and four of the syllabus and in the judgment.

---

[5] *State* v. *Elliott* (1971), 25 Ohio St. 2d 249, is not contra to this position. The thrust of *Elliott* is that an answer of "I don't think so," in response to the question of returning a penalty of death, may be interpreted as an "unambiguous no" answer by the trial court. As our subsequent holding in *Watson*, *supra*, points out, the trial court cannot assume that the venireman would vote against the death penalty. It must be *demonstrated* to the court. It is not the use of particular words chosen by a venireman that are determinative, but rather the import or meaning of what they convey. *Elliott* recognized this principle. Also, Dunn's *voir dire* shows that he would follow the law as given to him by the trial judge, a factor not present in *Elliott*.

[6] JUSTICE DUNCAN sat in this case during oral argument, but did not participate in the decision.