OPINION
{¶ 1} Defendant-Appellant John Paul Weber, III, appeals from his convictions and sentence for Murder, Kidnapping, Robbery, Tampering With Evidence, and Obstructing
Justice. Weber contends that the trial court erred in overruling his request to view grand jury *Page 2 
testimony and in refusing to instruct the jury on intervening and superseding causes of death. Weber also argues that his Kidnapping, Murder, and Obstructing Justice convictions are against the manifest weight of the evidence and that there is insufficient evidence to support those convictions. From our review of the record, we conclude that the trial court did not abuse its discretion, either in denying Weber's request to review grand jury testimony or in denying the requested jury instruction. Weber's convictions are supported by sufficient evidence and are not against the manifest weight of the evidence. Therefore, we affirm the judgment of the trial court.
 I {¶ 2} On July 9, 2006, Dayton Police Officer Douglas Brandenburg was on routine patrol when he saw a naked man in the grass at 454 Quitman Avenue. Officer Brandenburg approached the man, whom he recognized from the neighborhood as Myreon Mazur, nicknamed Chico. The officer asked what had happened, but Mazur only responded by saying, "I'm dying, man; I'm dying." Officer Brandenburg called for medics who transported Mazur to the hospital where he was soon pronounced dead.
 {¶ 3} During an autopsy the following morning, Mazur's body was observed to have abrasions and contusions on the face, left hand, and left shoulder. Internally, Mazur suffered from tears in his liver, small intestine, and pancreas as well as three broken ribs. Mazur bled to death as result of those internal injuries, which were caused by blunt force trauma to the abdomen.
 {¶ 4} During the course of their investigation, police talked to two witnesses, Robert Brown and Jeanie Williams, who had seen and heard Weber and Shawn Taylor arguing with Mazur and another man, nicknamed Crybaby, earlier that day. Weber and Taylor demanded *Page 3 
that the other men stay away from the Quitman address because that was where Weber and Taylor sold drugs, and they did not want Mazur and Crybaby infringing on their territory. Weber threatened to shoot them if they returned. Another man, Carl Mitchell, was present but did not take part in the confrontation.
 {¶ 5} Mazur and Crybaby left, but they returned later that day. In the meantime, Weber, Taylor, Mitchell, and a woman named Christina Windsor met at a nearby house on Pierce Street. Mitchell saw Brown and Williams, who were walking toward Pierce, and asked them if the men had returned to the Quitman address. Brown said that they had, and Mitchell ran to report the information to Weber and Taylor.
 {¶ 6} Weber, Taylor, Mitchell, and Windsor walked to Quitman, with Brown and Williams following. As they were approaching, they saw Crybaby driving away. They tried to get him to stop — Weber even hit a window on the car — but Crybaby continued to drive. Once at the Quitman house, Taylor grabbed Mazur in a choke hold and dragged him outside. Mitchell threw Mazur to the ground, and both he and Weber began kicking Mazur in the head and side. Taylor also threw a large rock onto Mazur's abdomen. Mazur stood and tried to run away, but Mitchell, Taylor, Weber, and Brown pushed him against a fence and stripped him of all of his clothing as they searched for drugs and money. The assailants finally let Mazur leave, and they took off in the opposite direction. Mazur stumbled away, collapsing in the churchyard across the street, which is where Officer Brandenburg eventually found him.
 {¶ 7} Later that evening Weber confided to Amanda Campbell that he had done "something really bad." Weber then asked Campbell to go to the Quitman house to see what she could find out.
 {¶ 8} Weber, identified as having been present during the beating, was visited by *Page 4 
detectives the following day. Weber claimed only to have witnessed the beating, not to have participated in it. He blamed everything on someone named Shawn and gave a general description; he did not provide a last name or means of contact. Knowing that Weber had recently been stopped by police while in the company of Shawn Days, the detectives compiled a photo spread including a photo of Days. Weber identified Days as the Shawn who had beaten Mazur to death. However, seeing Days in person after he was arrested, they realized that he did not at all fit the physical description given by witnesses and could not be the right Shawn. Eventually, the detectives learned that the Shawn who had been involved was Shawn Taylor, who lived across the street from Weber. Additionally, Weber and Taylor were known to be friends, and they were often seen together.
 {¶ 9} Weber was charged with two counts each of Murder and Kidnapping, and one count each of Robbery, Obstructing Justice, and Tampering With Evidence. Following a jury trial, Weber was found guilty of all charges. The trial court sentenced Weber to nineteen years to life in prison. From his convictions and sentence, Weber appeals.
 II {¶ 10} Weber's First Assignment of Error is as follows:
 {¶ 11} "THE VERDICT SHOULD BE REVERSED BECAUSE THE TRIAL COURT ERRED WHEN IT OVERRULED APPELLANT'S MOTION TO INSPECT THE GRAND JURY TESTIMONY OF CYNTHIA RYAN."
 {¶ 12} In his First Assignment of Error, Weber asserts that the trial court abused its discretion in refusing to allow him to inspect Cynthia Ryan's grand jury testimony for inconsistencies with her trial testimony. Disclosure of grand jury testimony is within the discretion of the trial court. State v. Greer (1981), 66 Ohio St.2d 139,420 N.E.2d 982, *Page 5 
paragraph one of the syllabus. An abuse of discretion implies that the trial court's attitude is unreasonable, arbitrary, or unconscionable.State v. Hancock, 108 Ohio St.3d 57, 2006-Ohio-160, ¶¶ 129-30. For the following reasons, we conclude that the trial court's denial of Weber's request to review the transcript of Ryan's grand jury testimony was not an abuse of discretion.
 {¶ 13} Grand jury testimony is secret, and an accused is not entitled to inspect a transcript of that testimony unless there is a showing by the defense of a particularized need for disclosure that, in the interest of justice, outweighs the need for secrecy. Greer, supra, at paragraph two of the syllabus, State v. Patterson (1871),28 Ohio St.2d 181, 277 N.E.2d 201, paragraph three of the syllabus, followed. When evaluating a claim of particularized need, a trial court must consider whether it is probable that the failure to disclose the testimony will deprive the defendant of a fair adjudication of the allegations placed at issue by the witness' trial testimony. Greer, supra, at paragraph three of the syllabus.
 {¶ 14} While cross-examining Ryan at trial, Weber learned that she had used a transcript of her grand jury testimony to refresh her recollection prior to testifying at trial. As soon as Weber realized that Ryan had used her grand jury testimony in preparing for trial, he requested that the trial court allow him to review that testimony. Weber generally argues that he needed to review Ryan's grand jury testimony to determine whether it was inconsistent with her trial testimony. However, as the Ohio Supreme Court has held, a defendant's "bald assertion . . . that he needed to examine the testimony of an adverse witness for inconsistencies failed to set forth a particularized need." State v.Mack (1995), 73 Ohio St.3d 502, 508, 653 N.E.2d 329. Furthermore, "[w]hen a defendant `speculates that the grand jury testimony might have contained material evidence or might have aided his cross examination . . . by revealing contradictions,' the trial court does not abuse its discretion by finding the defendant *Page 6 
had not shown a particularized need." Id., quoting State v. Webb (1994),70 Ohio St.3d 325, 337, 638 N.E.2d 1023.
 {¶ 15} Nothing in Ryan's trial testimony indicated the possibility of inconsistencies with her grand jury testimony; she merely revealed her use of that earlier testimony. Weber offers nothing more than a bald assertion of his need and speculation that there might be inconsistencies between Ryan's trial testimony and her grand jury testimony. He did not demonstrate that it was probable that the failure to disclose the grand jury testimony would deprive him of a fair trial.
 {¶ 16} Weber's argument differs from existing case law only in that here we have a witness who is known to have used her grand jury testimony to prepare herself for trial. Weber presumes that once he learned that Ryan had reviewed her grand jury testimony, he was necessarily entitled to review it as well. Even assuming, without deciding, that this is true, any error in the trial court's refusal to allow it was harmless beyond a reasonable doubt because the trial court did read Ryan's grand jury testimony and found no significant discrepancies with her testimony at trial. We have likewise read Ryan's grand jury testimony, and we concur in the trial court's assessment that any discrepancies with her trial testimony are trivial.
 {¶ 17} Weber's First Assignment of Error is overruled.
 III {¶ 18} Weber's Second Assignment of Error is as follows:
 {¶ 19} "THE VERDICT SHOULD BE REVERSED BECAUSE THE TRIAL COURT ERRED WHEN IT OVERRULED APPELLANT'S REQUEST OF A JURY INSTRUCTION ON INTERVENING AND SUPERCEDING [sic] CAUSES OF DEATH." *Page 7 
 {¶ 20} In his Second Assignment of Error, Weber maintains that the trial court should have granted his request for a jury instruction on intervening and superseding causes. The refusal to give a requested instruction is reviewed on appeal under an abuse of discretion standard.State v. Dixon, Montgomery App. No. 18582, 2002-Ohio-541, citation omitted. In this case the trial court did not abuse its discretion in denying Weber's request.
 {¶ 21} A trial court must give requested jury instructions that are pertinent to the case, state the law correctly, and are not covered in the general charge. Dixon, supra, citing State v. Scott (1986),26 Ohio St.3d 92, 497 N.E.2d 55. However, the court need not give the defendant's requested instructions verbatim. Id., citing State v.Sneed (1992), 63 Ohio St.3d 3, 584 N.E.2d 1160. Moreover, a trial court does not abuse its discretion in refusing to give a particular instruction when the substance of the requested instruction is included in the court's general charge to the jury. Id., citing Sneed, supra. At the conclusion of Weber's trial, he requested a jury instruction on intervening and superseding causes of death. In support, he claimed that Taylor's act of throwing a rock on Mazur was "totally out of the blue" and unexpected by anyone involved. On the other hand, the State asserted that it was foreseeable that someone would pick up something like a rock, during a brawl, and use it as a weapon. The trial court noted that the intervening and superseding cause instruction is included, at least in part, in the standard causation instruction that defines "cause" as "an act or failure to act which in the natural and continuous sequence directly produces the death and without which it would not have occurred. Proximate result means that the death must be the direct natural reasonably foreseeable consequence of the defendant's conduct as opposed to an extraordinary or surprising consequence when viewed in the light of ordinary experience." Relying on this Court's decision inDixon, and the causation instruction as given, the trial court *Page 8 
overruled Weber's request.
 {¶ 22} In Dixon, supra, we held that the defendant's involvement with an accomplice in an armed robbery set in motion a chain of events, one of the reasonably foreseeable consequences of which was the death of the accomplice. "The intervening act of the robbery victim . . . in shooting [Dixon's accomplice] was the most immediate and obvious cause of . . . death, but not the sole and exclusive cause." Id. In other words, Dixon's involvement in the robbery was a proximate cause of another's death, for which he should be held criminally responsible. Accordingly, we held that there was no abuse of discretion in the trial court's denial of Dixon's requested instruction on intervening causes.
 {¶ 23} The same reasoning applies in this case. The coroner testified that Mazur bled to death as a result of the internal injuries that he sustained in the beating. While Taylor's act of hurling a rock into Mazur's abdomen was the most immediate and obvious cause of death, it was not the sole cause of death. By engaging in the kidnapping and beating of Mazur, Weber set in motion a chain of events, one of the reasonably foreseeable consequences of which was Mazur's death. Because Weber's conduct was a proximate cause of Mazur's death, Weber is criminally responsible. Therefore, as in Dixon, supra, the trial court did not abuse its discretion in denying the sought-after instruction.
 {¶ 24} Weber's Second Assignment of Error is overruled.
 IV {¶ 25} Weber's Third Assignment of Error is as follows:
 {¶ 26} "THE VERDICT SHOULD BE REVERSED BECAUSE THE STATE FAILED TO INTRODUCE SUFFICIENT EVIDENCE TO PROVE ALL THE ELEMENTS OF KIDNAPPING THEREBY DENYING THE APPELLANT HIS RIGHT TO DUE PROCESS OF LAW UNDER *Page 9 
THE FOURTEENTH AMENDMENT TO THE UNITED STATES CONSTITUTION."
 {¶ 27} Weber's Fourth Assignment of Error is as follows:
 {¶ 28} "IN THE ALTERNATIVE, APPELLANT'S KIDNAPPING CONVICTIONS SHOULD BE REVERSED BECAUSE THE STATE FAILED TO MEET ITS BURDEN OF PROVING ALL ELEMENTS OF THE CRIME BEYOND A REASONABLE DOUBT AND, THEREFORE, THE CONVICTION IS AGAINST THE MANIFEST WEIGHT OF THE EVIDENCE."
 {¶ 29} In his Third and Fourth Assignments of Error, Weber maintains that his Kidnapping convictions must be vacated because they are against the manifest weight of the evidence and are unsupported by sufficient evidence. He also insists that his Murder conviction premised upon Kidnapping must be vacated because the State failed to prove that Kidnapping was the proximate cause of Mazur's death. We disagree.
 {¶ 30} A sufficiency of the evidence argument challenges whether the State has presented adequate evidence on each element of the offense to allow the case to go to the jury or to sustain the verdict as a matter of law. State v. Thompkins, 78 Ohio St.3d 380, 386, 1997-Ohio-52. The proper test to apply to such an inquiry is the one set forth in paragraph two of the syllabus of State v. Jenks (1991),61 Ohio St.3d 259, 574 N.E.2d 492: "An appellate court's function when reviewing the sufficiency of the evidence to support a criminal conviction is to examine the evidence admitted at trial to determine whether such evidence, if believed, would convince the average mind of the defendant's guilt beyond a reasonable doubt. The relevant inquiry is whether, after viewing the evidence in a light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime proven beyond a reasonable doubt." In contrast, when reviewing a judgment under a *Page 10 
manifest weight standard of review "[t]he court reviewing the entire record, weighs the evidence and all reasonable inferences, considers the credibility of witnesses and determines whether in resolving conflicts in the evidence, the [factfinder] clearly lost its way and created such a manifest miscarriage of justice that the conviction must be reversed and a new trial ordered. The discretionary power to grant a new trial should be exercised only in the exceptional case in which evidence weighs heavily against the conviction." Thompkins, supra, quotingState v. Martin (1983), 20 Ohio App.3d 172, 175, 485 N.E.2d 717.
 {¶ 31} Weber was convicted of Kidnapping under both R.C. 2905.01(A)(2) and 2905.01(A)(3), which prohibit one from removing a person from the place where he is found or restraining him of his liberty by force, threat, or deception, either for the purpose of terrorizing or inflicting serious physical harm or to facilitate the commission of any felony, in this case Robbery.
 {¶ 32} The evidence showed that earlier in the day, Weber and Taylor had threatened Mazur's life if he returned to the Quitman address. As soon as Weber and Taylor learned that Mazur had returned, they both headed to Quitman. Once there, Taylor grabbed Mazur in a choke hold, dragged him out of the house and threw him on the ground, where Weber repeatedly kicked Mazur. Taylor also punched and kicked Mazur, and then hurled a large rock into Mazur's abdomen. By accompanying Taylor to the Quitman address to confront Mazur, after having threatened his life earlier in the day, and by actively participating in the beating of Mazur after Taylor dragged him outside the house, Weber restrained Mazur of his liberty for the purpose of aiding in the infliction of serious physical harm.
 {¶ 33} When Mazur got up in an attempt to run away from his attackers, Weber and others tackled the severely injured Mazur into a fence, and held him there while they removed *Page 11 
all of his clothing and rifled his pockets looking for money and drugs, preventing Mazur from being able to promptly seek medical attention for his life-threatening injuries. Hours later, Mazur died from those injuries. Thus, Weber restrained Mazur of his liberty in order to facilitate the robbery.
 {¶ 34} Furthermore, as discussed in response to Weber's Second Assignment of Error, Weber's active participation in the kidnapping, beating, and robbery of Mazur was a proximate cause of Mazur's death. At no point did Weber attempt to distance or extricate himself from the crimes committed against Mazur. To the contrary, Weber was an active participant throughout all of the events that day. The State's evidence was sufficient to prove the Kidnapping and Murder charges, and the jury did not lose its way in choosing to believe the State's witnesses.
 {¶ 35} Finally, Weber asserts that his Kidnapping and Robbery convictions are allied offenses of similar import that were required to be merged. Because this issue was not raised in the trial court, Weber has waived all but plain error. State v. Long (1978), 53 Ohio St.2d 91,95-96, 372 N.E.2d 804; Crim. R. 52(B). While Kidnapping and Robbery are allied offenses of similar import, they must be merged under R.C. 2941.25(A) only when the force or constraint used in the Kidnapping is merely incidental to that used in the Robbery and does not create a separate risk of harm. State v. Campbell (Aug. 3, 1993), Montgomery App. No. 13138, citing State v. Parker (1986), 31 Ohio App.3d 128,508 N.E.2d 978. Relying on State v. Wynn, Montgomery App. No. 21710,2007-Ohio-4327, Weber insists that there was no substantial increase in the risk of harm to Mazur from the Kidnapping, separate from that involved in the Robbery. However, we find the facts of this case to be more like those in State v. Campbell, supra. *Page 12 
 {¶ 36} In Campbell we held that due to its potentially deadly consequences, a choke hold used during a Kidnapping created a substantial risk of harm separate and apart from that used for the Robbery of the victim, which occurred while the defendant sat on his victim to hold her on the ground, and the offenses therefore did not merge. In this case, not only was a choke hold initially used to restrain Mazur's freedom, but after being severely beaten, when Mazur tried to run away, Weber tackled Mazur against a fence and held him there while Mazur was robbed. Weber's actions may have aggravated Mazur's extensive injuries and certainly prevented him from seeking medical attention. The substantial risk of harm to the severely beaten man by being tackled against a fence was separate and apart from the restraint used to hold Mazur against the fence while he was robbed. Therefore, the offenses do no merge under R.C. 2941.25(A).
 {¶ 37} Weber's Third and Fourth Assignments of Error are overruled.
 V {¶ 38} Weber's Fifth Assignment of Error is as follows:
 {¶ 39} "THE STATE FAILED TO INTRODUCE SUFFICIENT EVIDENCE TO PROVE ALL THE ELEMENTS OF OBSTRUCTING JUSTICE THEREBY DENYING THE APPELLANT HIS RIGHT TO DUE PROCESS OF LAW UNDER THE FOURTEENTH AMENDMENT TO THE UNITED STATES CONSTITUTION."
 {¶ 40} Weber's Sixth Assignment of Error is as follows:
 {¶ 41} "IN THE ALTERNATIVE, APPELLANT'S OBSTRUCTING JUSTICE CONVICTION MUST BE REVERSED BECAUSE THE STATE FAILED TO MEET ITS BURDEN OF PROVING ALL ELEMENTS OF THE ALLEGED CRIME BEYOND A REASONABLE DOUBT AND, THEREFORE, THE CONVICTION IS AGAINST THE *Page 13 
MANIFEST WEIGHT OF THE EVIDENCE."
 {¶ 42} In his final two assignments of error, Weber contends that his Obstructing Justice conviction is against the manifest weight of the evidence and is unsupported by sufficient evidence. We disagree.
 {¶ 43} Weber was convicted of Obstructing Justice in violation of R.C. 2921.32(A)(5), which prohibits the communication of false information to law enforcement with a purpose to hinder the discovery, apprehension, prosecution, conviction, or punishment of another for a crime. See, also, State v. Bailey (1994), 71 Ohio St.3d 443, 448, 644 N.E.2d 314
(making an unsworn, false statement to a law enforcement officer with the purpose of hindering the officer's investigation of a crime is conduct that is punishable within the meaning of R.C. 2921.32(A)(5)).
 {¶ 44} Detectives first interviewed Weber the day after Mazur's death. During that interview, detectives showed him a photo spread that included Shawn Days, whom the police believed might have been the Shawn involved in these crimes. Weber knew Days and immediately incorrectly identified him as the Shawn in question. Subsequent conversations with Weber confirmed that he had not made a mistake, but that he was intentionally pointing police toward Days, who looked nothing like Taylor. With the help of other witnesses, police learned that it was Shawn Taylor that had been involved. Taylor lived directly across the street from Weber. The two men were known to be friends, and they were often seen together.
 {¶ 45} Although Weber contends that his identification of Shawn Taylor from the photo spread merely identified Taylor as someone Weber knew, not as one of the perpetrators, the following testimony of the investigating police officer, on redirect examination, supports a *Page 14 
conclusion that Weber identified the "wrong" Taylor as one of the perpetrators:
 {¶ 46} "Q. And in State's Exhibit number 67, the one you testified to, that's the one that he pointed out to you as being the person he saw beating Chico?
 {¶ 47} "A. Yes.
 {¶ 48} "THE COURT: I don't have a 67. Do I — do you have 67, Linda? Thought we had 70 — I'm sorry, my mistake. My mistake.
 {¶ 49} "MR. COX: We have a 67 and 71, your Honor.
 {¶ 50} "THE COURT: 71 I confused with 67. Thank you.
 {¶ 51} "REDIRECT EXAMINATION CONTINUED:
 {¶ 52} "BY MS. HOBSON:
 {¶ 53} "Q. That was the person he said was beating Chico?
 {¶ 54} "A. Yes."
 {¶ 55} Considered in a light most favorable to the State, the evidence presented could have convinced a reasonable trier of fact that all of the elements of Obstructing Justice were proven beyond a reasonable doubt. The jury did not lose its way in believing the State's evidence, and no manifest injustice occurred when Weber was found guilty of Obstructing Justice. Weber's Fifth and Sixth assignments of error are overruled.
 VI {¶ 56} All of Weber's assignments of error having been overruled, the judgment of the trial court is Affirmed.
 BROGAN and WALTERS, JJ., concur. *Page 15 
Hon. Sumner E. Walters, retired from the Third Appellate District, sitting by assignment of the Chief Justice of the Supreme Court of Ohio.
Copies mailed to:
Mathias H. Heck, Jr. R. Lynn Nothstine Thomas M. Kollin Hon. Michael T. Hall *Page 1