[Cite as *State v. Whatley*, 2014-Ohio-1126.]

COURT OF APPEALS
GUERNSEY COUNTY, OHIO
FIFTH APPELLATE DISTRICT


STATE OF OHIO                     :      JUDGES:
                                  :
                                  :      Hon. John W. Wise, P.J.
     Plaintiff-Appellee           :      Hon. Patricia A. Delaney, J.
                                  :      Hon. Craig R. Baldwin, J.
-vs-                              :
                                  :      Case No. 13CA26
                                  :
JAMES L. WHATLEY, JR.             :
                                  :
                                  :
                                  :
     Defendant-Appellant          :      O P I N I O N



CHARACTER OF PROCEEDING:          Appeal from the Guernsey County Court
                                  of Common Pleas, Case No. 13-CR-03



JUDGMENT:                         AFFIRMED



DATE OF JUDGMENT ENTRY:           March 10, 2014



APPEARANCES:

For Plaintiff-Appellee:                  For Defendant-Appellant:

DANIEL G. PADDEN                         CHANDRA L. ONTKO
GUERNSEY CO. PROSECUTOR                  665 Southgate Parkway
STEPHANIE L. MITCHELL                    Cambridge, OH 43725
139 West 8th St.
P.O. Box 640
Cambridge, OH 43725

*Delaney, J.*

{¶1} Defendant-Appellant James L. Whatley, Jr. appeals from the July 30, 2013 Judgment Entry of Sentence of the Guernsey County Court of Common Pleas. Appellee is the State of Ohio.

## FACTS AND PROCEDURAL HISTORY

*Maigen Blanchard Reaches Out to Tyler Burrell and Tells Him She Knows Where to Find Cash and Drugs*

{¶2} Maigen Blanchard lived in Cambridge, Ohio with her stepmom, Pam Pifer. Brock Dilley, Blanchard's boyfriend and the father of her children, was incarcerated. Blanchard decided to reach out to her former boyfriend, Tyler Burrell, through Facebook, and sent Burrell a message on June 20, 2012, asking him to come visit her in Cambridge. Burrell responded on Thursday, June 21, 2012, and came to Cambridge from Zanesville with his friend Anjomo "Boomer" Churchill. Churchill drove the pair to Cambridge in a light gold 2011 Chevy Cruze. Churchill was known to serve as Burrell's driver because Burrell did not have a valid license.

{¶3} Burrell and Churchill spent several hours in Cambridge that Thursday. They drove around with Blanchard and Pifer, "looking at houses." Burrell asked Blanchard, "Who is the white boy who drives an Avalanche with 30-day tags who's always over in Zanesville?" Blanchard told him it was Christopher Morrison, a friend of Brock Dilley's. She offered to point out where Morrison lived. She also told Burrell "she heard" Morrison had lots of money and was known to keep cash in his sock drawer and drugs in cereal boxes.

{¶4}   On that first visit to Cambridge, Blanchard showed Burrell and Churchill the location of Morrison's apartment complex, Coventry Estates, located on U.S. Route 22, east of State Route 77, in Guernsey County.   Burrell and Churchill dropped Blanchard off and didn't return that day.  She thought they were going to go to a party together on Friday, but Burrell didn't return calls and didn't pick her up as they had planned.  Burrell told her he'd come over on Saturday, June 23.

{¶5}   In the meantime, Burrell started gathering accomplices, telling them he knew of a "lick" (robbery) in Cambridge and asking if they wanted to be involved.  Elgin Mitchell and Deondre Crosby signed on and started planning.  Patience Sharrer drove Mitchell and Crosby to meet up with Burrell, who told Mitchell he needed to pick up "his dude," whom Mitchell understood to be an unnamed accomplice from Columbus.

*Blanchard and Burrell Direct the Group to "Hit a Lick"*

{¶6}   Saturday night, June 23, 2012, Blanchard was hanging out in Cambridge with Pifer and her friend Whitney Ford.  She received multiple calls from Burrell on the landline phone, which Pifer could overhear, including discussion about robbing someone.  Ford also heard discussion that people were "on their way," and Blanchard said she could show them where Morrison lived.

{¶7}   Around 2:00 a.m., the same light-colored Chevy Cruze pulled up and parked in front of the house, again driven by Churchill, with Burrell in the front passenger seat [the "Burrell car"].  Pifer and Ford noticed a second, darker car following the Burrell car, which pulled past the house and parked down the street.  Alarmed, Pifer told Blanchard that if she got in the car, not to bother coming back.  Heedless, Blanchard approached the Burrell car and attempted to open the rear driver's-side door.

A man inside, previously unseen, held the door shut. She went around the other side, got in the car, and drove off. The dark car followed closely behind. Pifer and Ford watched both cars stop at the stop sign and turn left, headed in the direction of Coventry Estates.

*Christopher Morrison and Justain Nelson Celebrate a Birthday*

{¶8} June 23, 2012 was Christopher Morrison's birthday. He lived in Apartment C in a four-apartment building at Coventry Estates with his pregnant fiancée, Nijier Thomas. The two spent the day together at the apartment and gathered food and liquor for a planned birthday cookout later that evening in Zanesville. Morrison and Thomas headed to the party in Zanesville around 6:00 p.m. in Morrison's green Avalanche.

{¶9} Present at the birthday party were Justain Nelson, Morrison's best friend, and Nelson's mother, Theresa Glover. The party lasted until around 11:00 p.m., then some of the guests went to the "U Bar," a location in Zanesville. Morrison, Thomas, and Nelson were in the Avalanche and stayed in the parking lot. Morrison and Thomas argued because he had been drinking and she didn't want him to drive. Thomas ended up staying behind at the "U Bar" with friends while Morrison and Nelson drove off in the Avalanche. Glover saw her son in the truck with Morrison.

{¶10} Around 1:15 a.m., Morrison called Thomas to say he was home.

*The Burrell Car and the Sharrer Car Drive by Coventry Estates*

{¶11} The Chevy Cruze was driven by Churchill; Burrell was in the front passenger seat; Blanchard was behind him in the back seat, and a fourth black male was in the rear driver's-side seat. Churchill and Blanchard did not identify this man;

Blanchard said he had "old braids" which were partially grown out and spoke to someone on an "Obama phone." Churchill said the man did not speak but at one point Burrell had mentioned his name was "Zone."

{¶12} The black car following the Burrell car was a rented Mazda driven by Patience Sharrer [the "Sharrer car"]. Also in the car were Deondre Crosby and Elgin Mitchell.

{¶13} The two cars drove past Coventry Estates. Blanchard pointed out the apartment of Christopher Morrison. Morrison's Avalanche was parked in the rear of the building. Both cars turned around, pulled down a side street, and stopped. Blanchard and Burrell directed Mitchell and Crosby to the apartment. The man with "old braids" got out of the Burrell car and into the Sharrer car.

{¶14} Burrell, Churchill, and Blanchard drove off and proceeded to spend the next hour driving around Cambridge.

{¶15} At trial, Elgin Mitchell identified appellant as the man from Columbus, the individual with "old braids" who got into Sharrer's car. Sharrer drove; Crosby was in the front passenger seat; Mitchell and appellant were in the back seat. The Sharrer car headed back toward Coventry Estates; Burrell called again to say which apartment it was.

{¶16} Sharrer pulled over and stopped. Mitchell, Crosby, and appellant exited the car, climbed over a guardrail, and hid near a tree near the apartment building. They could see into the apartment through the blinds; two men appeared to be asleep inside, on two separate couches.

*The Home Invasion and Murders:  Elgin Mitchell's Account*

{¶17} Mitchell said he had no weapon on him and didn't see a weapon on Crosby or appellant prior to the robbery.  Appellant put on a ski mask he brought along.

{¶18} Appellant rammed open the front door with his arms and was the first to enter the apartment, followed by Crosby and Mitchell.  Mitchell saw appellant now had a black pistol he thought was a .9 millimeter semi-automatic.  Crosby proceeded directly up the stairs inside the door to the bedrooms.  Appellant went towards Justain Nelson, the man sleeping on the couch against the wall.  Christopher Morrison was on a couch in front of the window.  Mitchell stood back, guarding the door.

{¶19} Crosby came back downstairs after a very short time, now holding a .22 revolver, asking Morrison "where the money at (*sic*)."  Morrison responded he didn't know what Crosby was talking about.  Appellant ran into the kitchen and started rifling through cereal boxes, then came back into the living room and again stood in front of Nelson.  Nelson told Morrison "Just give it up" and Morrison said again "I don't know what you're talking about."  Crosby then shot Morrison in the face.

{¶20} Nelson stood up and tried to run, crashing through the sliding glass doors in the rear of the apartment, off the kitchen.  Appellant shot Nelson in the back as he fled.

*The Burrell Car Returns to the Area of Coventry Estates*

{¶21} During the home invasion and murders, the Burrell car drove around Cambridge.  Burrell was getting calls on his cell phone and eventually told Churchill to head back in the general direction of Coventry Estates.  Someone on the phone told Burrell he saw the car's headlights.  The "same guy from before," the unidentified black

male, got into the backseat of the Burrell car and they drove to Zanesville. Churchill said the man had changed clothes.

{¶22} Churchill later testified there was no conversation in the car about what happened during the robbery. He claimed to know nothing until the next day when Burrell told him "when they did that they killed those people."

{¶23} Churchill would later return to the spot where he picked up the man, with detectives, telling them the man said he thought he lost his gun there.

*The Neighbors React after the Murders*

{¶24} Neighbors heard commotion shortly after 2:00 a.m. on Sunday, June 24, 2012 that sounded first like someone kicking a door in and then like someone running up and down the stairs of Apartment C. Then witnesses heard several gunshots, then silence. Neighbors looked out their windows and saw no one in the immediate aftermath of the shots, so several called 911 and left their apartments to investigate.

{¶25} They found Christopher Morrison in the front of the apartment complex, on the ground, still breathing but covered in blood. Morrison died at the scene shortly thereafter as city police, sheriff's deputies, and emergency medical personnel arrived.

{¶26} Troopers discovered Justain Nelson in the backyard of the apartment complex, lying motionless on the ground, moaning, with blood on his chest, shirt, and face. He was transported for medical treatment but died at the hospital.

*Both Victims Die of Multiple Gunshot Wounds*

{¶27} The autopsy performed on Christopher Morrison revealed five gunshot wounds, including one near his left eye, neck, shoulder, chest, and thigh. Justain Nelson sustained four gunshot wounds: to the middle of his back, between his belt line

and his shoulders; his left lower abdomen, his left thigh, and his left buttock. The bullets recovered from the body of Morrison were a different size, shape, and caliber than the bullets recovered from the body of Nelson. Nelson also sustained sharp, incised wounds to his right palm, and scrapes and abrasions to his elbows, forearms, knee, and heel, consistent with running and falling through glass. Toxicology tests on both victims revealed no evidence of any illicit drug use; both men's blood tested positive for beverage alcohol.

{¶28} Both victims died of multiple gunshot wounds. The coroner opined that in both cases, death was not necessarily instantaneous: both victims were capable of running a short distance, then passing out and bleeding to death from their wounds, consistent with the scene discovered by neighbors, law enforcement, and emergency medical personnel in which both men were found short distances from the apartment, linked by trails of blood.

*The Investigation*

{¶29} In the immediate aftermath of the murders, witnesses came forward. Family members of the victims gathered at the crime scene and provided Detective Williams of the Guernsey County Sheriff's Department with the names of Maigen Blanchard and Tyler Burrell. During the day more people called in reporting Blanchard's involvement, and Blanchard herself called Williams around 3:30 p.m. Sunday, initially denying her role.

{¶30} Law enforcement began a series of interviews with suspects they were able to identify, starting with Blanchard. Over a series of interviews, Blanchard was initially deceptive, prompting police to bring in her incarcerated boyfriend, Brock Dilley,

to convince her to cooperate.  Blanchard then provided the names of Boomer Churchill and Tyler Burrell, and stated there was a second black car driven by a skinny white female containing two black males she didn't know.  She also stated a third unknown black male arrived at her stepmother's house in the Burrell car; she believed this person to be Burrell's associate from Columbus.

{¶31} Williams interviewed Boomer Churchill, who provided the names of Deondre Crosby, Elgin Mitchell, and Patience Sharrer.  He, too, mentioned an unknown black male in the group, a friend of Burrell's from Columbus, possibly known by the nickname "Zone."

{¶32} Williams used the suspects' cell phone records to track down multiple calls the night of the murders with a 614 area code number.  The subscriber to this number is Christine Pollard, the mother of appellant James Whatley, Jr. and Jamar Whatley, appellant's brother who lives in Zanesville.  The phone number relates to a government-issued "Obama phone."  The cell phone records also put the user of the Pollard phone in the immediate vicinity of Coventry Estates on the night of the murders.  The Ohio Bureau of Criminal Investigation (BCI) reported that DNA tests on a nylon cap found during evidence collection came back with a CODIS hit matching appellant.  Williams also learned appellant's Facebook alias is "War Zone."  Another number identified in the cell phone traffic from the night of the murders was traced to Nicole Groves, mother of two of appellant's children.

{¶33} Boomer Churchill offered to take detectives to the area where he picked up the unknown Columbus accomplice after the murders.  In the tall weeds and grass

around this wooded area, detectives found clothing, a holster, and a black Smith and Wesson .9 millimeter semi-automatic pistol.

{¶34} The BCI firearms expert testified State's Exhibit O, the bullet recovered from the body of Justain Nelson, could not be positively identified as having come from the Smith and Wesson .9 millimeter, but it could not be ruled out, either.

*The Home Invasion and Murders: Appellant's Account*

{¶35} Appellant was the only defense witness at trial. He testified he was at his brother's house in Zanesville on Friday, June 22, 2012 when Tyler Burrell came over and mentioned "licks" that he knew of, asking appellant whether he wanted to be involved. That night, Burrell showed up with Churchill, they picked up appellant and two other unknown males, and drove around looking at potential robbery sites. Each site that night was ruled out for various reasons, but Burrell stated he still had the possibility of something else: he called a girl, put her on speakerphone, and she said "it's in there." Burrell then dropped off appellant at his brother's house.

{¶36} The next evening, Saturday, June 23, Burrell returned and asked if appellant wanted to take a look at something else; there would be $60,000 in cash and no guns involved. Appellant ripped two t-shirt sleeves off a work shirt to cover his face with; he denied wearing a ski mask at any point. Burrell and Churchill arrived very early Sunday morning to pick him up; Churchill drove and Burrell was on the phone off and on. They were followed by another car. They pulled up at a house, a girl came out and tried to get in the Churchill car; at first appellant resisted letting her into the car because he was angry that Burrell was involving more people.

{¶37} Both cars proceeded toward Coventry Estates and Burrell and Blanchard pointed out the target apartment. At some point, appellant learned Burrell had no intention of entering the apartment himself and appellant was angry because Burrell wanted others to commit the robbery he set up.

{¶38} Appellant did not know the men in the dark car. Throughout his testimony he referred to Mitchell as "the taller one" and Crosby as "the shorter one." The three lay on the ground by a tree outside the apartment and could see through the blinds that two people were inside. (Appellant stated he was told no one would be there.) He noticed Mitchell had a gun in his hand.

{¶39} Appellant stated he opened the front door of the apartment easily by hitting it with his arms. Appellant remained outside the apartment at first; Mitchell entered, went to Nelson, woke him, and made him lay on the ground; Crosby ran upstairs and very quickly came back down with a gun in his hand. Morrison then sat up on the other couch and Crosby pushed him back down. Appellant entered the apartment because he didn't want to stay outside. Mitchell told appellant to close the blinds and he did so. Appellant stated he was in the process of closing the apartment door when he heard "pow, pow, pow" and he took off running away from the apartment.

{¶40} Outside, he called Burrell to say "Those dudes started shooting." He asked the Burrell car to come back to pick him up because the Sharrer car was gone. The Burrell car came back for him. Appellant said he told Burrell, Blanchard, and Churchill what happened in the apartment and was very upset and angry. He told Churchill to drop him off in an alley in Zanesville because he didn't want anyone in the group to know where "his people" lived.

*"The First One on the Bus gets the Best Seat"*

{¶41} At trial Det. Williams acknowledged the evidence tying appellant to the murders is circumstantial; the only testimony placing a gun in appellant's hand is Mitchell's. When asked, Williams agreed he has heard the axiom "The first one on the bus gets the best seat." Appellant's accomplices entered negotiated guilty pleas and in exchange for their truthful testimony appellee will not object to judicial release earlier than the stated terms: Megan Blanchard received a 10-year prison term; Boomer Churchill a 6-year prison term; Tyler Burrell a 15-year prison term; and Elgin Mitchell an 11-year prison term. Patience Sharrer was not criminally charged and failed to appear at trial upon subpoena. Deondre Crosby apparently has not yet been tried; the record is silent as to the outcome of his indictment.

*Conviction and Sentence: Life Without Parole*

{¶42} Appellant was found guilty of one count of complicity to aggravated murder with a firearm specification (Count I) for the death of Christopher Morrison. He was found guilty of one count of aggravated murder with a firearm specification (Count II) for the death of Justain Nelson. He was also found guilty of aggravated robbery (Count III) and aggravated burglary (Count IV), both with firearm specifications. The parties agreed Counts III and IV merged into Counts I and II for sentencing purposes, and appellant could only be sentenced upon one firearm specification.

{¶43} On Count I, complicity to aggravated murder, appellant was sentenced to a prison term of 25 years to life. On Count II, aggravated murder, appellant was sentenced to life in prison without the possibility of parole. Upon the single firearm specification, he received a consecutive term of 3 years.

{¶44} Appellant now timely appeals from the judgment entry of his conviction and sentence.

{¶45} Appellant raises two assignments of error:

**ASSIGNMENTS OF ERROR**

{¶46} "I. THE TRIAL COURT ABUSED ITS DISCRETION BY FAILING TO ORDER THE STATE OF OHIO TO PROVIDE A TRANSCRIPT OF FORMER TESTIMONY GIVEN BY A CODEFENDANT AT THE TIME OF HER NEGOTIATED PLEA AND AT THE TIME OF HER TESTIMONY BEFORE THE GRAND JURY."

{¶47} "II. THE TRIAL COURT ABUSED ITS DISCRETION BY NOT REMOVING A JUROR DUE TO HER SIGNIFICANT COUGHING AND ORDERING THAT AN ALTERNATE JUROR SERVE IN HER PLACE BECAUSE THE JUROR'S SIGNIFICANT COUGHING PREVENTED THE DEFENDANT FROM HAVING A FAIR TRIAL."

**ANALYSIS**

I.

{¶48} In his first assignment of error, appellant argues he should have been provided with the grand jury testimony of Maigen Blanchard. We disagree.

{¶49} Upon direct examination, describing events leading to the murders, Blanchard stated after she was picked up by the Burrell car, they proceeded to Coventry Estates followed by the Sharrer car, and when she pointed out Christopher Morrison's apartment, Burrell placed a call to someone in the other car giving them directions about which apartment it was. Further, after the Burrell car containing Burrell, Churchill, and Blanchard drove away from Coventry Estates to drive around Cambridge, Burrell

received multiple calls "from [appellant]" stating the Sharrer car had left him so the Burrell car needed to return and pick him up. Appellant's trial counsel objected stating "all this is new to me," and appellee responded every prior statement of Blanchard was provided in discovery. Defense trial counsel clarified the difference in Blanchard's testimony was her statement that she went to Coventry Estates on the night of the murders and appellant called Burrell; counsel said he was never advised of any prior statement to this effect.

{¶50} The trial court noted Blanchard made four statements to law enforcement, all of which the defense was provided with, and defense counsel could cross-examine accordingly. Appellee mentioned he did not have the grand jury testimony transcribed and defense trial counsel argued he had now demonstrated a particularized need for the grand jury testimony. The trial court disagreed and ruled the matter could be adequately explored with cross examination. Appellant now argues the grand jury testimony should have been provided.

{¶51} Ohio Crim. R. 6(E) provides, in part, that "[d]eliberations of the grand jury and the vote of any grand juror shall not be disclosed." However, if the defense shows a "particularized need" for disclosure that outweighs the need for secrecy, all relevant portions of a grand jury transcript should be produced. *State v. Greer*, 66 Ohio St.2d 139, 420 N.E.2d 982 (1981), paragraph two of the syllabus. A "particularized need" exists "when the circumstances reveal a probability that the failure to provide the grand jury testimony will deny the defendant a fair trial." *State v. Davis*, 38 Ohio St.3d 361, 365, 528 N.E.2d 925 (1988). A claim of particularized need cannot be replete with speculation and innuendo. *State v. Stojetz*, 84 Ohio St.3d 452, 460, 1999-Ohio-464, 705

N.E.2d 329. The decision whether to release grand jury testimony "is within the discretion of the trial court." *Greer*, supra, at paragraph one of the syllabus. A decision to deny release will not be reversed absent an abuse of discretion. *State v. Brown*, 38 Ohio St.3d 305, 308, 528 N.E.2d 523 (1988). In order to find an abuse of discretion, the reviewing court must determine that the trial court's decision was unreasonable, arbitrary, or unconscionable and not merely an error of law or judgment. *Blakemore v. Blakemore*, 5 Ohio St.3d 217, 219, 450 N.E.2d 1140 (1983).

{¶52} The claim of particularized need in this case consists entirely of speculation. Appellant did not articulate or demonstrate any particularized need for grand jury testimony. See, *State v. Cutts*, Stark App. No. 2008CA000079, 2009-Ohio-3563, appeal not allowed, 123 Ohio St.3d 1509, 2009-Ohio-6210, 917 N.E.2d 812, cert. denied by *Cutts v. Ohio,* 560 U.S. 904, 130 S.Ct. 3276, 176 L.Ed.2d 1183; see also, *State v. Jacocks*, 5th Dist. Stark No. 2002CA00359, 2003-Ohio-6839 ¶ 111-112, appeal not allowed, 102 Ohio St.3d 1445, 2004-Ohio-2263, 808 N.E.2d 397.

{¶53} Further, impeachment through material inconsistencies may be a proper basis for disclosure of grand jury testimony, but that purpose alone is not sufficient. *State v. Patterson*, 28 Ohio St.2d 181, 277 N.E.2d 201(1971). The claim that a witness's grand jury testimony may differ from trial testimony is insufficient to show a particularized need. *State v. Henness*, 79 Ohio St.3d 53, 62, 679 N.E.2d 686 (1997).

{¶54} Appellant speculates on appeal (and at trial) Blanchard's grand jury testimony may have contained some inconsistency. As we have previously recognized, "the mere fact that the testimony before the grand jury may contain inconsistencies does not rise to the level of a particularized need." *State v. Harper*, 5th Dist. Guernsey

No. 13 CA 15, 2013-Ohio-3897 ¶ 22, citing *State v. Cherry*, 107 Ohio App.3d 476, 478–479, 669 N.E.2d 45 (5th Dist.1955). On the record before us, we find the trial court did not abuse its discretion in ruling cross-examination was an adequate remedy for testing alleged inconsistencies in Blanchard's statements.

{¶55} Appellant's first assignment of error is overruled.

II.

{¶56} In his second assignment of error, appellant argues the trial court abused its discretion by not removing a juror due to "significant coughing." We disagree.

{¶57} On page 528 of the trial transcript, the trial court notes Juror 12 is having a coughing fit and asks whether she is able to proceed, explaining they can take a break or substitute an alternate. The juror replies she is able to continue. Later, after more testimony and a recess, the trial court notes Juror 12 may have discovered she can't continue. Juror 12 states she is still coughing and losing her voice. (T. 545). The prosecutor states he didn't notice any coughing at all and wants her to stay; defense counsel states she could be excused. The prosecutor requests a voir dire of the jury prior to dismissing Juror 12.

{¶58} The jurors on either side of Juror 12 state the coughing is not bothering them and they are able to hear the proceedings with no trouble; the entire jury is polled as to whether they are affected by the coughing and they unanimously vote no, they are not affected at all. (T. 549). The trial court therefore permitted Juror 12 to remain on the jury without objection, a decision which appellant asserts denied him a fair trial.

{¶59} Replacement of jurors with alternates is wholly within the trial court's discretion and is addressed by a statute and the Criminal Rules. R.C. 2945.29 states:

If, before the conclusion of the trial, a juror becomes sick, or for other reason is unable to perform his duty, the court may order him to be discharged. In that case, if alternate jurors have been selected, one of them shall be designated to take the place of the juror so discharged. If, after all alternate jurors have been made regular jurors, a juror becomes too incapacitated to perform his duty, and has been discharged by the court, a new juror may be sworn and the trial begin anew, or the jury may be discharged and a new jury then or thereafter impaneled.

{¶60} Crim.R. 24(G)(1) provides in pertinent part, "Alternate jurors in the order in which they are called shall replace jurors who, prior to the time the jury retires to consider its verdict, become or are found to be unable or disqualified to perform their duties." It is up to the trial court to determine the point at which a juror is unable to perform her duties. "Whether a juror is unable to perform his duty is a determination that lies within the trial court's discretion." *State v. Mitchell*, 5th Dist. Muskingum No. CT2006-0090, 2007-Ohio-5519, ¶ 57, appeal not allowed, 117 Ohio St.3d 1424, 2008-Ohio-969, 882 N.E.2d 445, and reopened on other grounds, 5th Dist. Muskingum No. CT2006-0090, 2009-Ohio-5251, appeal not allowed, 124 Ohio St.3d 1476, 921 N.E.2d 247, 2010-Ohio-354. In order to find an abuse of discretion, the reviewing court must determine that the trial court's decision was unreasonable, arbitrary, or unconscionable and not merely an error of law or judgment. *Blakemore*, supra, 5 Ohio St.3d at 219.

{¶61} The trial court did not abuse its discretion in permitting Juror 12 to remain upon the jury. The juror stated she was able to continue and the entire panel was

unanimously unaffected by her coughing.  Moreover, no objection was raised to the trial court's decision, and we find no plain error in the trial court's decision to allow Juror 12 to remain on the panel.

{¶62} Appellant's second assignment of error is overruled.

## CONCLUSION

{¶63} Appellant's two assignments of error are overruled and the judgment of the Guernsey County Court of Common Pleas is affirmed.

By:  Delaney, J. and

Wise, P.J.

Baldwin, J., concur.